PER CURIAM.
 

 Steven Douglas Hayward appeals from a judgment of conviction of first-degree murder and sentence of death.
 
 [1]
 
 He also appeals his convictions for armed robbery, armed burglary of a conveyance, and possession of a firearm by a convicted felon. For the reasons set forth below, we affirm the convictions and the sentence of death.
 

 OVERVIEW
 

 Steven Douglas Hayward (Hayward) was convicted of the first-degree murder of Daniel Destefano (Destefano) in St. Lu-cie County. Hayward was also convicted of robbery with a deadly weapon, burglary of a conveyance while armed, and possession of a firearm by a convicted felon. Destefano, a newspaper delivery man in Fort Pierce, was robbed and shot while filling up a newsstand at a convenience store in the early morning hours of February 1, 2005. The jury found Hayward guilty of all charges. During the penalty phase, after considering several aggravating circumstances, including Hayward’s prior conviction for second-degree murder, and mitigation presented by the defense, the jury voted eight to four to recommend a sentence of death, which the trial court imposed.
 

 Hayward raises nine claims on appeal. In addition to considering the claims raised by Hayward, we have a mandatory duty to examine the sufficiency of the evidence and to determine if Hayward’s death sentence was proportionate. We first examine the facts surrounding the murder.
 

 
 *24
 
 FACTS AND PROCEDURAL HISTORY
 

 The Circumstances of the Murder and the Investigation
 

 Sometime before 4 a.m. on the morning of February 1, 2005, Destefano arrived at a convenience store and began filling the vending machine with newspapers. Deste-fano had secured a concealed weapons permit for a .357 caliber silver revolver which he was wearing in a holster on his belt. Roosevelt McDowell (McDowell), a resident of a nearby rooming house, heard “hollering” and heard Destefano shout, “I don’t have no more, I don’t have no more.” McDowell then heard two gunshots followed by another, louder gunshot. He opened the door to his room and saw a person he described as Mexican
 
 [2]
 
 on one knee who was continuing to say, “I don’t have no more.” McDowell saw a black man searching through a nearby car. McDowell testified that the man then went to the street light on the corner where McDowell could see the man examining his bleeding left hand. According to McDowell, the man was wearing some sort of head covering. McDowell then saw Deste-fano limp away in an easterly direction and saw the black man take a short-cut around McDowell’s rooming house, leaving the area in a westerly direction.
 

 Sometime shortly after 4 a.m., Destefa-no was found about a block away by an early morning fisherman, who called 911. Officer James Grecco of the Fort Pierce Police Department received the 911 dispatch and quickly responded, arriving about two or three minutes before the paramedics arrived. As the paramedics prepped Destefano for transport, Officer Grecco asked Destefano, “What happened?” Destefano stated that a black male with a black stocking cap over his face ran up to him and shot him. He also told the officer that he fired back with his handgun, but that he “didn’t know what happened to it.” Soon thereafter, Destefa-no lost consciousness and died.
 

 Dorothy Smith, Hayward’s girlfriend, lived in a rooming house a few blocks away from the convenience store where Destefa-no was shot. According to Smith, on the morning of the shooting, Hayward arrived at her room just before dawn with an injury to his hand. He claimed the injury was inflicted by two black men who robbed him and shot him in the hand. Smith immediately urged him to go to the hospital and asked if he wanted her to call an ambulance or the police. Hayward vehemently refused Smith’s offer and even unplugged the telephone to prevent her from calling anyone. Hayward then went around the rooming house asking various residents to sew up his hand, but no one would do so.
 

 A few hours later, when Smith learned from a television newscast that someone had been shot at the convenience store, she asked Hayward about the shooting. He denied any involvement and told her that he had been shot at a different location. Just before Smith left for the store that morning to buy something for breakfast, she retrieved a bloody ten-dollar bill Hayward had placed in a drawer that morning. When she returned, she found Hayward packing his bags to leave, but she convinced him to stay. Shortly thereafter, Hayward sold a silver handgun for $100.
 
 [3]
 

 Two days after the shooting, the police responded to Smith’s rooming house after receiving a report that someone there had a possible gunshot wound to the hand and
 
 *25
 
 had been asking the residents to sew it up. When the officers arrived, they found the front door open but asked and received permission from other residents to enter the common area. The residents then directed the officers to Smith’s open door where they knocked on the door frame and Smith answered. As Smith was talking to the officers, Hayward came out of the communal bathroom located directly across from Smith’s room and walked into the hallway where the officers were standing. The officers immediately noticed his bandaged hand and asked if they could see the wound. Hayward removed the bandage and, when the officers asked him what happened, he and Smith both indicated that Smith had “cut” him with a knife. At this point, Detective Dan Flaherty asked Officer Darren Mace and Hayward to go outside so he could talk with Smith alone. Hayward complied and stepped outside with the officer, where Officer Mace asked him to come to the police station to talk about the “cut” on his hand. Hayward agreed and was handcuffed before being placed in the back seat of the police car. Officer Mace told Hayward that he was not under arrest, and that it was police policy to handcuff anyone being transported in a police car.
 

 After being handcuffed, but just before entering the car, Hayward suddenly stated to Officer Mace that he “wasn’t going to lie,” that he had been robbed the other day and thought he had been shot. Officer Mace left Hayward in the squad car and went to inform Detective Flaherty of Hayward’s statement. Smith, who was within hearing distance of the officers’ conversation, then revised her story as well. She said that she had gotten in an argument with Hayward the afternoon before the murder and had stabbed him in the hand. She added that when he returned the next morning, he told her that he had been shot in the very same hand by two black men who robbed him.
 

 Once at the police station, Officer Mace took off Hayward’s handcuffs but secured him by an ankle bracelet to a table in an interview room. Hayward was then advised of his
 
 Miranda
 
 rights.
 
 [4]
 
 After waiving his
 
 Miranda
 
 rights and agreeing to discuss the incident, Hayward provided the officers with several different versions of how his hand was injured. He told the officers that he lied when he first claimed he had been stabbed. He explained that he had actually been robbed by two men, one black and one Mexican, while trying to sell marijuana at the convenience store. Hayward told the officers that he was shot in the hand as he tried to take the gun away from the black robber.
 

 Hayward subsequently changed his story again, this time stating that he was not robbed at all, but instead had witnessed Destefano being robbed and shot by a lone black man. Hayward said that he attempted to pick up a gun left at the scene but dropped it and it went off, shooting him in the hand. He told the officers that even though his hand was bleeding, he went through Destefano’s car looking for anything of value. After concluding his statement, Hayward was arrested for Des-tefano’s murder.
 

 
 *26
 
 A few months later, when the common laundry room in Smith’s rooming house was renovated, a black .22 caliber revolver identified as the murder weapon was found behind a board covering a vent in the wall. Hayward’s blood was discovered inside the gun’s firing chambers.
 

 Medical Examiner Dr. Charles Diggs testified that Destefano suffered a nonfatal injury to his left thigh from a .22 caliber bullet that entered the thigh horizontally, which was consistent with Destefano standing up when the shot was fired. Des-tefano died as a result of internal bleeding caused by a second .22 caliber bullet that entered Destefano’s upper left chest area and traveled downward at a forty-five-degree angle, coming to rest in his lower intestine. This was consistent with Deste-fano having been shot from above, while kneeling.
 

 Because he bled internally, Destefano’s blood was not found at the crime scene. On the other hand, a great deal of Hayward’s blood was found at the crime scene, on several of Destefano’s personal items found strewn around his car, on the door frame of Destefano’s car, on several locations on the outside walls of McDowell’s rooming house, and on a fence post adjacent to the rooming house. The hooded jacket that Hayward was wearing the morning of the murder evidenced a number of heavy blood transfer stains
 
 [5]
 
 originating from Hayward. There was a large tear on the inside pocket of the jacket, which also bore evidence of Hayward’s blood. Criminalist Earl Ritzline testified that the tear was big enough to have been used as a hiding place for two guns. Significantly, even though in his statement to the police Hayward denied touching Deste-fano, the front and back of Destefano’s pants were stained with large amounts of Hayward’s blood, including heavy transfer blood stains on Destefano’s back pockets. Ritzline opined that the perpetrator had pushed his bloody hand inside the pockets while searching them.
 

 The jury also heard portions of two taped telephone calls Hayward made to Smith from jail shortly after his arrest, which the State offered as proof of Hayward’s consciousness of guilt and to show Hayward was attempting to coach Smith in her testimony. At the close of the evidence, the defense argued in a motion for judgment of acquittal that the State had not refuted Hayward’s hypothesis that he was only an observer and not the actual shooter. The motion was denied and the case was submitted to the jury. The jury found Hayward guilty of first-degree murder, robbery, burglary of a conveyance, and possession of a firearm by a convicted felon.
 

 Penalty Phase and Sentencing
 

 - During the penalty phase, the State presented evidence of Hayward’s 1988 convictions for second-degree murder and two counts of armed robbery. A witness to the 1988 crimes testified that he was standing outside a bar talking to the victim when Hayward and his codefendant began shooting Uzis in the parking lot. Hayward approached the victim from behind and said, “Let me have it.” When the victim looked over his shoulder and laughed, Hayward shot the victim from behind. The witness stated that after the first shot, Hayward repeatedly pulled the trigger on the Uzi, but it had apparently jammed and only made a clicking sound. The lead detective in that case testified that the victim was shot in the groin area and bled
 
 *27
 
 to death. The detective testified that when questioned, Hayward admitted he was present when the murder occurred, but claimed that he was only an observer. Hayward also told the police that two black youths from Fort Lauderdale committed the murder, and he offered a location where the perpetrators might be found. Hayward eventually pled nolo con-tendere to the crimes.
 

 Victim impact testimony was offered by Destefano’s mother, sister and fiancée. They spoke about Destefano’s character, his hard work, and how much he would be missed by them.
 

 In mitigation, Hayward presented the testimony of psychologist Dr. Michael Reardon, as well as the testimony of four family members: Hayward’s brother, his two sisters, and his mother. Dr. Reardon testified that Hayward had the potential to be rehabilitated because he had shown an ability to focus on learning despite his low average IQ (91), as exemplified by his attainment of a GED while in prison for the first murder. The psychologist also indicated that Hayward had made license plates and worked in other areas while in prison. Hayward’s mother testified that due to the family’s financial difficulties, she had to work two jobs and was absent from the home quite often. In her absence, Hayward’s older half-siblings took care of and disciplined him. Hayward’s mother testified that his siblings often picked on Hayward and even beat him up. She testified that Hayward’s stepfather was present in the home during Hayward’s early years, but later, Hayward’s biological father, an alcoholic, came to live with the family. Hayward grew up without a consistent father-figure in his life. The jury recommended a death sentence by a vote of eight to four.
 

 In sentencing Hayward to death, the court found three aggravators: (1) that Hayward had prior violent felony convictions based on his convictions for second-degree murder and two counts of armed robbery, to which the court assigned “extremely great weight”; (2) that the murder was committed during the course of a robbery; and (3) that the murder was committed for pecuniary gain. The court found that the second and third aggrava-tors merged and gave the single aggravating circumstance “great weight.” There were no statutory mitigators offered or found, but the court found the following nonstatutory mitigators applicable: (1) Hayward could have received a life sentence; (2) he grew up without a father; (3) he was loved by his family; (4) he had academic problems; (5) he obtained a GED in prison; (6) he would make a good adjustment to prison; (7) he had financial stress at the time of the crime; and (8) he had some capacity for rehabilitation. Each was given “little weight” except for the factor that Hayward could have gotten a life sentence, which was given “very little weight,” and the factor that he grew up without a father, which was given “some weight.” The trial court, in the sentencing order, summarized its reasoning in sentencing Hayward to death as follows:
 

 Not only does this Court find that the totality of the aggravating circumstances in this case far outweigh the mitigating circumstances, but the Court expressly finds that
 
 each
 
 statutory aggravator, when considered
 
 alone
 
 outweighs the totality of the mitigating circumstances.
 

 The facts supporting the Defendant’s previous conviction for Second Degree Murder and Armed Robberies, which formed the basis of the first statutory aggravating circumstance are compelling. When compared to the facts and circumstances of the murder and robbery in this case, they are alarming. The Defendant had been released from
 
 *28
 
 the Department of Corrections eighty-seven (87) days prior to committing another murder and robbery in which the life of another innocent human being was senselessly ended. It is difficult to imagine how the Defendant could have robbed and killed a person in 1988, served 16 years in prison for those crimes with more than enough time to contemplate the horrific, irreversible and unforgivable consequences of his actions, yet within ninety days of release from prison, commit the same crimes resulting in the same horrific, irreversible and unforgivable consequences.
 

 ISSUES ON APPEAL
 

 On appeal, Hayward asserts that (1) the statements of the murder victim to police describing his attacker were improperly admitted under the excited utterance and dying declaration exceptions to the hearsay rule, and in violation of the Confrontation Clause; (2) introduction of Hayward’s statements to police at the rooming house and their observations while there violated his Fourth Amendment rights; (3) introduction of the recorded jail conversations between Hayward and Smith were more prejudicial than probative due to the vulgarity of the language used, affecting both the guilt and penalty phases; (4) comments made by the prosecutor in closing argument during the penalty phase comparing the life choices made by the victim and Hayward constituted prosecutorial misconduct requiring resentencing; (5) there was insufficient evidence concerning the identity of the shooter; (6) there was insufficient evidence as to whether a robbery was actually accomplished; (7) there was insufficient evidence establishing premeditation; (8) the standard jury instruction on premeditation is insufficient; (9) Florida’s sentencing scheme is unconstitutional under the United States Supreme Court’s decision in
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002);
 
 [6]
 
 and (10) imposition of a death sentence based on an eight-to-four jury recommendation is unconstitutional. We will first analyze Hayward’s claims challenging the admission of evidence in the guilt phase of the trial.
 

 EVIDENTIARY CLAIMS
 

 Hayward asserts that the trial court committed a number of errors in admitting evidence. In this section, we will discuss the following claims of error: (1) that the statements of the murder victim to police describing his attacker were improperly admitted under the excited utterance and dying declaration hearsay exceptions, and in violation of the Confrontation Clause; (2) that admission of statements Hayward made to police and their observations at the rooming house violated his Fourth Amendment rights; and (3) that the introduction of the recorded telephone conversations between Hayward and Smith was more prejudicial than probative due to the vulgarity of the language used.
 

 Hearsay Claim
 

 Hayward asserts that the trial court erred in allowing into evidence Destefano’s statement describing his attacker to the first responding police officer. He contends that the statement was improperly admitted under the dying declaration and excited utterance exceptions to the hearsay rule, and that admission of the statement violated the Confrontation Clause.
 
 See
 
 U.S. Const, amend. VI.
 

 Officer Grecco testified at trial that as Destefano was being prepped for transport
 
 *29
 
 by the paramedics, Grecco asked him, “What happened?” Destefano was able to tell Officer Grecco that a black male with a black stocking cap over his face ran up to him and shot him. He also told the officer that he fired back with his handgun but that he “didn’t know what happened to it.” Soon thereafter, Destefano lost consciousness and died. The trial court overruled Hayward’s hearsay objection, ruling that the statement was admissible both as an excited utterance and a dying declaration. As discussed below, we conclude that Des-tefano’s statement qualified as an excited utterance but not as a dying declaration. We also conclude that even though the statement qualified as an excited utterance, its admission violated the Confrontation Clause because the statement was testimonial.
 
 See Crawford v. Washington,
 
 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). However, any error in admitting the statement was harmless beyond a reasonable doubt.
 

 A. Excited Utterance Exception
 

 A trial judge’s ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion.
 
 Alston v. State,
 
 723 So.2d 148, 156 (Fla.1998). The trial court’s discretion is constrained, however, by the application of the rules of evidence,
 
 Johnston v. State,
 
 863 So.2d 271, 278 (Fla.2003), and by the principles of stare decisis.
 
 McDuffie v. State,
 
 970 So.2d 312, 326 (Fla.2007). In order for a statement to qualify as an excited utterance exception to the hearsay rule pursuant to section 90.803(2), Florida Statutes (2007), “the statement must be made: (1) ‘regarding an event startling enough to cause nervous excitement’; (2) ‘before there was time to contrive or misrepresent’; and (3) “while the person was under the stress or excitement caused by the event.’ ”
 
 Hudson v. State,
 
 992 So.2d 96, 107 (Fla.2008) (quoting
 
 Henyard v. State,
 
 689 So.2d 239, 251 (Fla.1996)).
 

 First, Destefano had been shot during the course of a robbery — clearly an event startling enough to cause the nervous excitement required by section 90.803(2). It is not necessary that the statement illustrate the startling event; it is enough that the statement relate to the event.
 
 See Johnson v. State,
 
 969 So.2d 938, 950 (Fla.2007). Here, Destefano’s statement that the robber was a “black man wearing a black stocking cap” relates to the event that caused the startling nervous excitement.
 

 Second, this Court has explained that “[wjhile an excited utterance need not be contemporaneous to the event, it must be made while the declarant is under the stress of the startling event and without time for reflection.”
 
 Hudson,
 
 992 So.2d at 107 (quoting
 
 Hutchinson v. State,
 
 882 So.2d 943, 951 (Fla.2004)). The statement must be made without time for reflective thought because it is the lack of time to contrive or misrepresent the facts that provides the reliability for such statements.
 
 See Hudson,
 
 992 So.2d at 107. Although the exact amount of time that passed between when Destefano was shot and when he made his statement to Officer Grecco is unclear, “[t]he test regarding the time elapsed is not a bright-line rule of hours or minutes.”
 
 Rogers v. State,
 
 660 So.2d 237, 240 (Fla.1995);
 
 see also
 
 Edward W. Cleary,
 
 McCormick on Evidence,
 
 § 297, at 856 (3d ed.1984). We have held that the “[flactors that the trial judge can consider in determining whether the necessary state of stress or excitement is present are the age of the declarant, the physical and mental condition of the de-clarant, the characteristics of the event and the subject matter of the statements.”
 
 Hudson,
 
 992 So.2d at 108 (quoting
 
 Williams v. State,
 
 967 So.2d 735, 748 (Fla.2007)).
 

 
 *30
 
 In
 
 Williams,
 
 we held that the trial court did not abuse its discretion in admitting as an excited utterance a statement made by a victim twenty minutes after the incident. In so holding, we noted that the trial court had before it evidence of the physical and mental condition of the declarant and the characteristics of the event.
 
 See Hudson,
 
 992 So.2d at 108 (reiterating factors that may be considered in determining if the declarant is still under the stress of the event). This evidence included the fact that the declarant was “still grievously injured,” having suffered multiple stab wounds and punctured lungs, and was “upset, and fading in and out of consciousness” at the time of the statement.
 
 Williams,
 
 967 So.2d at 749.
 

 In
 
 Henyard v. State,
 
 689 So.2d 239 (Fla.1996), the defendant kidnapped a mother and her two children. He raped the mother, shot her four times and left her for dead, although she ultimately survived. He took the children to another location where he shot and killed them both. We held that the mother’s statements to a police officer were properly admitted as excited utterances even though she made her statements several hours after the shooting.
 
 Id.
 
 at 251. After being left on the side of the road, the mother lost consciousness for a few hours. When she regained consciousness, she made her way to a nearby house where she collapsed on the porch and the occupants called the police. When an officer arrived, the victim was hysterical but coherent when she told him about the event. At trial, the officer was permitted to testify that immediately after his arrival, she told him that two young black males raped and shot her and then took her children. We held the officer’s testimony was proper as an excited utterance exception to the hearsay rule and stated, ‘While the length of time between the event and the statement is a factor to be considered in determining whether that statement may be admitted under the excited utterance exception, the immediacy of the statement is not a statutory requirement.”
 
 Id.
 
 (citation omitted).
 

 Here, although some amount of time passed between the shooting and the time that Destefano spoke to the police officer, the medical examiner testified that Deste-fano was bleeding internally and that someone in his condition would become increasingly light-headed and dizzy. Additionally, Officer Grecco testified that Des-tefano was having difficulty breathing and appeared “scared, frightened, and terrified.” The officer added that Destefano “wasn’t verbal [or] speaking at all” within minutes of Grecco’s arrival at the scene. Given Destefano’s physical and emotional condition following his devastating injuries, the evidence clearly indicates he was still under the effect of the startling events of that early morning, thus supporting a conclusion that he did not engage in reflection prior to making the statement. We therefore conclude that the statement qualified as an exception to hearsay pursuant to section 90.803(2) and that the trial court did not err in finding the statement to be an excited utterance.
 

 B. Dying Declaration Exception
 

 We now examine whether Deste-fano’s statement was admissible under the dying declaration exception to the hearsay rule. Pursuant to section 90.804(2)(b), Florida Statutes (2007), and this Court’s prior rulings, the deceased must have known and “appreciated his condition as being that of an approach to certain and immediate death,” although it is not necessary that the declarant “make express utterances” that he would never recover.
 
 Henry v. State,
 
 613 So.2d 429, 431 (Fla.1992) (quoting
 
 Lester v. State,
 
 37 Fla. 382, 20 So. 232, 233 (1896)). “Rather, the court should satisfy itself, on the totality of the
 
 *31
 
 circumstances,” that the deceased knew he was dying.
 
 Id.
 
 (quoting
 
 Lester,
 
 20 So. at 233). This Court has said the “absence of all hope of recovery, and appreciation by the declarant of his speedy and inevitable death, are a preliminary foundation that must always be laid to make such declarations admissible.”
 
 McRane v. State,
 
 142 Fla. 240, 194 So. 632, 636 (1940) (quoting
 
 Lester,
 
 20 So. at 233). Further, the de-clarant must not have merely considered himself in imminent danger, but he must have “believed he was
 
 without hope of
 
 recovery.”
 
 Dixon v. State,
 
 13 Fla. 636, 640 (1870);
 
 see also Morris v. State,
 
 100 Fla. 850, 130 So. 582, 584 (1930) (“[The declar-ant] knew unquestionably, that he had been mortally wounded.”).
 

 Thus, under our established precedent, in order for Destefano’s statement to be considered a dying declaration, he must have believed his death was imminent. A clear example of an admissible dying declaration is found in
 
 Williams,
 
 where we concluded that the trial court did not err in admitting a statement as a dying declaration. There, the evidence showed that the declarant, who suffered grievous injuries, expressed numerous times that she believed she was dying and that she would not survive her injuries.
 
 Williams,
 
 967 So.2d at 749. In the present case, although the medical examiner testified that someone in Destefano’s condition would “know something was radically wrong,” the evidence showed that he also knew the ambulance had arrived and that he was receiving medical attention. There is no evidence suggesting that Destefano lacked all hope of recovery or believed his death was imminent. Thus, we must conclude that the trial judge erred in admitting the statement as a dying declaration.
 

 C.
 
 Crawford v. Washington
 

 Even though Destefano’s statement qualified as an excited utterance exception to the hearsay rule, its admission resulted in a violation of Hayward’s rights under the Confrontation Clause. “In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him .... ” U.S. Const, amend. VI. The Supreme Court laid the analytical framework for a Confrontation Clause violation when it stated “[w]here testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.”
 
 Crawford,
 
 541 U.S. at 68, 124 S.Ct. 1354.
 
 [7]
 
 Prior to
 
 Crawford,
 
 the issue was controlled by
 
 Ohio v. Roberts,
 
 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which held that a hearsay statement could be introduced in a criminal trial without resulting in a Confrontation Clause violation if it was shown that the declarant was unavailable and the out-of-court statement bore adequate indicia of reliability. In
 
 Roberts,
 
 the Court focused on the reliability of the statement, concluding that a statement had “adequate indicia of reliability if it either fell within a firmly rooted hearsay exception or it bore ‘particularized guarantees of trustworthiness.’ ”
 
 Blanton v. State,
 
 978 So.2d 149, 154 (Fla.2008) (quoting
 
 Roberts,
 
 448 U.S. at 66, 100 S.Ct. 2531).
 

 The Supreme Court’s decision in
 
 Crawford
 
 abandoned the
 
 Roberts
 
 indicia of reli
 
 *32
 
 ability test and held that the introduction of a hearsay statement will result in a violation of the defendant’s Sixth Amendment right to confrontation if (1) the statement is testimonial; (2) the declarant is unavailable; and (3) the defendant lacked a prior opportunity for cross-examination of the declarant. “Only [testimonial statements] cause the declarant to be a “witness’ within the meaning of the Confrontation Clause.”
 
 Davis v. Washington,
 
 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). “It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.”
 
 Id.
 
 This Court has also recognized that “[t]he mere fact that evidence meets the requirements of an exception to the hearsay rule does not necessarily mean it is admissible as evidence.”
 
 State v. Lopez,
 
 974 So.2d 340, 345 (Fla.2008).
 

 In
 
 Davis,
 
 the United States Supreme Court held that the statements made by the victim to a 911 operator during the course of an attack were not testimonial, and were therefore admissible, because the victim “simply was not acting as a
 
 witness;
 
 she was not
 
 testifying.” Id.
 
 at 828, 126 S.Ct. 2266. In the companion case of
 
 Hammon v. Indiana,
 
 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the victim was waiting on the front porch and the assailant was inside when the police arrived. The victim was escorted to a separate room where she was questioned and filled out a complaint affidavit about the incident. The Supreme Court held that the victim’s statement in
 
 Hammon
 
 was testimonial because “[t]here was no emergency in progress” and the “primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime.”
 
 Id.
 
 at 829-30, 126 S.Ct. 2266.
 

 The Supreme Court in
 
 Davis
 
 discussed other factors that may be considered when determining whether a statement is testimonial, such as (1) whether the declarant was speaking about events that were currently happening or circumstances that could currently be responded to, as opposed to events that were clearly in the past and could only be investigated and litigated; (2) whether the declarant was facing an ongoing emergency (describing or seeking help for current physical danger); and (3) whether the setting of the declarant’s statement was a perilous crime scene or a safe location. Thus, we shall examine the evidence in this case in light of the above-mentioned factors. As discussed below, based on application of the three factors set forth in
 
 Davis,
 
 we conclude that while Destefano’s statement qualifies as an excited utterance, its admission violated the Confrontation Clause because it was testimonial.
 

 First, Destefano was speaking about past events that could only be investigated or litigated. He had already been robbed and shot, and his statement described that past occurrence.
 
 See Davis,
 
 547 U.S. at 827, 126 S.Ct. 2266 (distinguishing between the interrogation in
 
 Davis
 
 from
 
 Crawford
 
 on the basis that in
 
 Davis,
 
 the victim “was speaking about events as
 
 they were actually happening,
 
 rather than ‘describing] past events’ ” (quoting
 
 Lilly v. Virginia,
 
 527 U.S. 116, 137, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)).
 

 Second, at the time Destefano made his statement, he was receiving medical attention and was being prepped for transport to a hospital. Officer Grecco already knew that he was responding to a shooting incident, and Destefano’s statement simply answered Officer Grecco’s question as to “what happened.” The statement was not meant to help the officer respond to an emergency; rather, it was aimed at assist
 
 *33
 
 ing the officer in investigating, locating, and prosecuting the perpetrator. “When we said ... that ‘interrogations by law enforcement officers fall squarely within [the] class’ of testimonial hearsay, we had immediately in mind ... interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator.”
 
 Davis,
 
 547 U.S. at 826, 126 S.Ct. 2266 (quoting
 
 Crawford,
 
 541 U.S. at 53, 124 S.Ct. 1354).
 

 Third, Destefano found help approximately one block away from the scene of the attack and his assailant had already left, heading in the opposite direction.
 
 See, e.g. People v. Cage,
 
 40 Cal.4th 965, 56 Cal.Rptr.3d 789, 155 P.3d 205, 217-218 (2007) (finding statements made by the victim to be testimonial in nature where the statements were made in a different location than the attack and there was no danger of further violence). Because Des-tefano was being attended to by numerous professionals, including a police officer, he was not in peril at the time of his statement.
 

 Accordingly, given these findings, we conclude that even though Destefano’s statement to Officer Grecco constituted an excited utterance, his statement was testimonial in nature, and therefore its admission into evidence violated the Confrontation Clause.
 
 [8]
 

 D. Harmless Error Analysis
 

 Even though we have determined that admission of Destefano’s statement was erroneously admitted in violation of the Confrontation Clause, we conclude that the error was harmless beyond a reasonable doubt. In
 
 State v. DiGuilio,
 
 491 So.2d 1129 (Fla.1986), this Court articulated the inquiry which must be undertaken to determine if an error requires reversal or is harmless beyond a reasonable doubt. Once error has been established, “[t]he question is whether there is a reasonable possibility that the error affected the verdict.”
 
 Id.
 
 at 1139. The burden is on the State, “as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.”
 
 Id.
 
 at 1135. In making this analysis, the Court will consider both “the permissible evidence on which the jury could have legitimately relied” and “the impermissible evidence which might have possibly influenced the jury verdict.”
 
 Id.
 

 Given the strength and nature of the other evidence connecting Hayward to the crime on which the jury could have relied, we find that there is no reasonable possibility that the admission of Destefano’s statement affected the verdict. First, the statement did not specifically identify Hayward — it simply identified the perpetrator as a “black male” with a cap. Further, more than one witness provided the police with virtually the same description given by Destefano to Officer Grecco. McDowell also testified that the perpetrator was a black man with some sort of head covering or hat, and Hayward himself testified that the perpetrator was a “black guy with [a] mask on.” Thus, the information that the assailant was a black man with some sort of head covering was properly introduced at trial through two witnesses other than Destefano, and the jury would have heard it even if Officer Grecco had not testified. Additionally, Hayward confessed to the burglary and confirmed all the events of
 
 *34
 
 the robbery, and there was extensive forensic evidence tying Hayward to the murder. “[W]here the evidence introduced in error was not the only evidence on the issue to which the improper evidence related, the introduction can be harmless.”
 
 Hojan v. State,
 
 3 So.3d 1204, 1210 (Fla.2009);
 
 see also Henyard,
 
 689 So.2d at 251 (finding the introduction of the victim’s statements through the officer’s testimony constituted harmless error where the statements were also introduced through the victim’s testimony). Because there was additional substantial, reliable and admissible evidence that the perpetrator was a black male with some sort of head covering, the admission of Destefano’s statement was harmless beyond a reasonable doubt and Hayward is not entitled to relief on this issue.
 

 The Police Encounter at the Rooming House, Hayward’s Statements, and the Issue of Probable Cause
 

 We now examine the evidence of Hayward’s statements made both at the rooming house and at the police station, as well as the observations made by the police at the rooming house, to determine if introduction of any of that evidence violated Hayward’s constitutional rights. We also examine Hayward’s claim that the police had no probable cause to detain him.
 

 The Fourth Amendment to the United States Constitution and section 12 of Florida’s Declaration of Rights guarantee citizens the right to be free from unreasonable searches and seizures.
 
 See
 
 U.S. Const, amend. IV; art. I, § 12, Fla. Const. Evidence obtained in violation of those constitutional protections is generally excluded.
 
 Golphin v. State,
 
 945 So.2d 1174, 1179-80 (Fla.2006). The Fourth Amendment requires all warrantless “seizures” of a person to be founded upon at least reasonable suspicion that the individual seized is engaged in wrongdoing.
 
 See United States v. Mendenhall,
 
 446 U.S. 544, 552, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion). However, only when the police, “by means of physical force or show of authority, [have] in some way restrained the liberty of a citizen” is there a “seizure” of that person.
 
 Terry v. Ohio,
 
 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). “Seizures of the person” include both formal arrests and “seizures that involve only a brief detention short of traditional arrest.”
 
 Mendenhall,
 
 446 U.S. at 551, 100 S.Ct. 1870 (quoting
 
 United States v. Brignoni-Ponce,
 
 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). As the Supreme Court has observed, the inquiry in law enforcement encounter cases is whether there has been an “intrusion upon constitutionally protected rights.”
 
 Mendenhall,
 
 446 U.S. at 553, 100 S.Ct. 1870 (plurality opinion) (quoting
 
 Terry,
 
 392 U.S. at 19 n. 16, 88 S.Ct. 1868).
 

 In
 
 Taylor v. State,
 
 855 So.2d 1, 14-15 (Fla.2003), we discussed the three levels of encounter that a person may have with law enforcement: (1) a consensual encounter that involves only minimal police contact during which a citizen may either voluntarily comply with a police officer’s requests or choose to ignore them and leave; (2) an investigatory stop as enunciated in
 
 Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), during which a police officer may detain a citizen temporarily if the officer has a reasonable, well-founded, and articulable suspicion that a person has committed, is committing, or is about to commit a crime; and (3) an “arrest,” which must be supported by probable cause that a crime has been or is being committed. “When determining whether a particular encounter is consensual, the Court must look to the ‘totality of the circumstances’ surrounding the encounter to decide ‘if the police conduct would have communicated to a reasonable person that
 
 *35
 
 the person was free to leave or terminate the encounter.’ ”
 
 Taylor,
 
 855 So.2d at 15 (quoting
 
 Voorhees v. State,
 
 699 So.2d 602, 608 (Fla.1997)).
 

 In order to determine if Hayward’s Fourth Amendment rights were violated, we must first determine if and when Hayward was “detained.” We do so by dividing the police encounter with Hayward into four time frames: (1) the initial encounter when Hayward exited the bathroom into the hallway inside the rooming house; (2) the instance when Detective Flaherty asked Officer Mace to take Hayward outside; (3) the instance outside the rooming house when Hayward asserted that he had actually been robbed and shot, not stabbed; and (4) the official statement made by Hayward at the police station after having been advised of his
 
 Miranda
 
 rights. We will also discuss whether there was probable cause to detain him and whether his Fourth Amendment rights were violated during any of these police encounters.
 

 A. The First Time Frame: In the Hallway
 

 Hayward’s initial encounter with the police occurred at Smith’s rooming house after he stepped out of the bathroom and into the hallway, which was occupied by a number of police officers. Hayward asserts that due to the number of officers, the fact that he stepped directly into the group, and that a rifle or shotgun was present (although not aimed at anyone), the entire police encounter was non-consensual from the start. He argues that under these circumstances, his statements and actions were not voluntary, but rather resulted from compelled acquiescence to the apparent authority of the police and that the encounter was an “arrest.” Moreover, Hayward argues that the police had no physical evidence linking him to the crime, no murder weapon, and “nothing” putting him at the scene of the crime, thereby rendering his arrest without probable cause. We disagree.
 

 Applying the three-level police-encounter criteria set forth in
 
 Taylor,
 
 we conclude that Hayward’s initial encounter with the police inside Smith’s rooming house was consensual. While the police were clearly looking for a suspect (a black man with a gunshot wound to his hand), they did not know Hayward was in the bathroom and did nothing to compel him to come out of the bathroom into the hallway. Rather, Hayward emerged from the bathroom of his own accord. After the police inquired about his bandaged hand, Hayward and Smith indicated that Smith had stabbed him following a domestic dispute. When Hayward removed his bandage, it was in response to Officer Mace simply asking if he could take a look at it. At no point did Officer Mace, or any other member of law enforcement, have a weapon drawn or demand to see the wound. Accordingly, the initial report that Hayward’s wound was the result of a stabbing incident and the police officer’s testimony that the wound appeared to be an infected gunshot wound, not a stab wound, were properly admitted.
 

 B. The Second Time Frame: Stepping Outside with Officer Mace
 

 We next examine the level of police encounter associated with the request that Officer Mace and Hayward step outside of the rooming house while Detective Flaherty spoke with Smith. Detective Flaherty testified that Smith appeared very nervous and he thought she might want to say something to the officers but was afraid to do so in Hayward’s presence. Considering the assertion that Hayward sustained the wound on his hand during a domestic dispute with Smith, the officers reasonably separated Smith and Hayward. Thus, when Hayward and Officer Mace
 
 *36
 
 stepped outside while Detective Flaherty and Smith spoke, this action was not a detention. Further, since a crime had allegedly been committed
 
 against
 
 Hayward by Smith (i.e., that Smith had stabbed him), Officer Mace’s subsequent request that Hayward come to the station to discuss “the cut” was not a detention.
 

 C. The Third Time Frame: Sudden Change of Story as to the Wound
 

 Next, we examine the circumstances surrounding the handcuffing of Hayward for the trip to the police station and his subsequent statement. Once Hayward agreed to accompany Officer Mace to the police station, he was handcuffed and placed in the back seat of the patrol car. Prior to handcuffing Hayward, Officer Mace explained to him that it was police policy to handcuff all persons transported in police vehicles. As he was entering the vehicle, Hayward suddenly stated that he “wasn’t going to lie.” He then told Officer Mace that he had been robbed and shot.
 

 The State concedes that handcuffs are restraining devices but contends that Hayward was not detained because the use of handcuffs during transport was a routine safety measure followed by the police. Although Hayward was in the process of being handcuffed pursuant to police policy at the time of his statement, the totality of the circumstances, including the purpose of the officer’s conduct and the spontaneous nature of Hayward’s statement, demonstrate that his statement was not the result of any alleged illegal detention.
 
 See, e.g., Brown v. Illinois,
 
 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In addition to this Fourth Amendment analysis, we must also consider any Fifth Amendment implications.
 
 See Voorhees,
 
 699 So.2d at 611. Hayward agreed to accompany the police to the station for further questioning and his statement was clearly spontaneous and voluntary and thus not the product of interrogation.
 
 See Ramirez v. State,
 
 739 So.2d 568, 573 (Fla.1999) (“Interrogation takes place ... when a person is subjected to express questions, or other words or actions, by a state agent, that a reasonable person would conclude are designed to lead to an incriminating response.”) (quoting
 
 Traylor v. State,
 
 596 So.2d 957, 966 n. 17 (Fla.1992));
 
 see also Johnson v. State,
 
 660 So.2d 648, 659 (Fla.1995) (concluding that the defendant’s statement was voluntary and spontaneous and not elicited by any interrogation);
 
 State v. Foster,
 
 562 So.2d 808, 810 (Fla. 5th DCA 1990) (holding that spontaneous statements are not always the product of an interrogation);
 
 Rosher v. State,
 
 319 So.2d 150, 152 (Fla. 2d DCA 1975) (“Spontaneous statements are admissible in evidence [when they] are not the product of interrogation.”). Based on the foregoing, we conclude that there is no merit to Hayward’s claim that his voluntary, unsolicited statement that he had been shot, not stabbed, should have been suppressed.
 

 D. The Fourth Time Frame: Hayward’s Statement at the Police Station
 

 Once at the station, Officer Mace took Hayward’s handcuffs off, but secured him by an ankle bracelet to a table in an interview room, where he was advised of his
 
 Miranda
 
 rights. Thereafter, Hayward agreed to discuss the incident and gave the officers several versions of how his hand was injured. While we agree with Hayward that he was clearly “detained” when he made these statements, we find that the statements were properly admitted into evidence because they were made after he had been advised of his
 
 Miranda
 
 rights and after he indicated that he wished to
 
 *37
 
 proceed "with the questioning.
 
 [9]
 

 E. Probable Cause
 

 Finally, we reject Hayward’s contention that the police did not have probable cause to detain or arrest him, had they actually chosen to do so at the rooming house. In
 
 Walker v. State,
 
 707 So.2d 300 (Fla.1997), we explained:
 

 Probable cause for arrest exists where an officer “has reasonable grounds to believe that the suspect has committed a felony. The standard of conclusiveness and probability is less than that required to support a conviction.”
 
 Blanco v. State,
 
 452 So.2d 520, 528 (Fla.1984). The question of probable cause is viewed from the perspective of a police officer with specialized training and takes into account the “factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.”
 
 Schmitt v. State,
 
 563 So.2d 1095, 1098 (Fla. 4th DCA 1990).
 

 Id.
 
 at 312. Utilizing these criteria here, we conclude that the police had probable cause to detain Hayward for further questioning. By the time the police encountered Hayward at the rooming house, they had already interviewed McDowell, who described the assailant as being a black man with what appeared to be a bleeding left hand, who fled the scene in the general direction of Smith’s rooming house. McDowell’s statements, including the description of the different sounds of the gun shots, along with Destefano’s statement to the officer that he shot at his assailant, provided reasonable grounds to believe that Destefano’s assailant had in fact been shot.
 
 [10]
 
 Smith’s rooming house was only a few blocks away from the crime scene, and police found a blood trail leading in that general direction. Only two days after the shooting, the police were notified that a person at the rooming house had a possible gunshot wound to the hand and had been asking residents to sew it up. When the police saw Hayward’s wound, they observed that it looked like a gunshot wound. Finally, when Hayward’s story drastically changed during the encounter, it became clear that he had lied about the cause of the injury to his hand. Based on the totality of the circumstances, the police had reasonable grounds, and therefore probable cause, to conclude that a felony had been committed and that Hayward had committed it. Thus, relief is denied on this claim.
 

 The Recorded Jail Conversations
 

 We now turn to Hayward’s assertion that the recorded conversations he had with Smith from jail were improperly admitted into evidence because the conversations were more prejudicial than probative.
 
 [11]
 
 He contends that the profane lan
 
 *38
 
 guage he used during these conversations unduly prejudiced the jury during the guilt and penalty phases.
 

 At trial, the State sought to play portions of two telephone calls Hayward made to Smith from the jail shortly after his arrest. Their asserted purpose was to show that Hayward had called Smith to tell her what he had told the officers, so that her statement would mirror his. The State also asserted that Hayward’s instructions to Smith in one of the telephone calls to get rid of the “reefer,” which both knew did not exist, was code instructing Smith to get rid of the murder weapon.
 
 [12]
 
 Hayward clearly knew that the calls were taped or monitored — he specifically told Smith, “They record these phones.”
 

 The State argued that redacting the extensive vulgarity in the tapes would leave such a void as to render them meaningless. Further, the State urged, it was significant that Hayward’s language increasingly worsened as Smith failed to listen to what he was telling her to say and do. During one of the conversations between Hayward and Smith, the following colloquy took place:
 

 HAYWARD: Soon as you get [off] this phone, you hear me. Huh? Do you hear me, Dot? ... Soon as you get [off] this phone .... Go get up Charles.
 

 SMITH: Huh?
 

 HAYWARD: Go get up Charles, you know what I’m talking about.
 

 SMITH: Okay. No, I can’t do that.
 

 HAYWARD: Why?
 

 SMITH: Not-uh. No, I ain’t trusting nobody, no. No ....
 

 HAYWARD: I told you—
 

 SMITH: But I, they ain’t got the gun though.
 

 Although Hayward’s language throughout his conversations with Smith contained extensive vulgarity, Hayward’s obscenity became extreme after Smith’s reference to the gun. The State argued that Hayward’s explosion of anger over the use of the word “gun” constituted admissible evidence of consciousness of guilt. The trial court concluded that “the relevance [of the tapes] is not outweighed by any prejudicial [e]ffect” and allowed the tapes to be played for the jury, with a transcript provided for their review during the playing of the tapes. Before we begin our analysis of this issue, we review the test to be applied in such cases.
 

 Admission of probative but potentially prejudicial evidence is controlled by section 90.403, Florida Statutes. It states in pertinent part:
 

 90.403 Exclusion on the grounds of prejudice or confusion — Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.
 

 § 90.403, Fla. Stat. (2007). In
 
 State v. McClain,
 
 525 So.2d 420, 422 (Fla.1988), we explained the balancing test a trial court must perform under section 90.403 in determining whether relevant evidence is admissible against a defendant at trial. We stated:
 

 This statute compels the trial court to weigh the danger of unfair prejudice against the probative value. In applying the balancing test, the trial court necessarily exercises its discretion. Indeed, the same item of evidence may be admissible in one case and not in another, depending upon the relation of that item to the other evidence.
 

 
 *39
 
 At issue in this case was the identity of Destefano’s killer. Central to this issue was the presence of Hayward’s blood on a number of items found at or near the crime scene. As noted earlier, Hayward provided several explanations for the presence of his blood at the crime scene. The tapes, including the language used as well as the context in which the conversations took place, provided relevant information for the jury to consider when assessing the reliability of his explanations. Professor Ehrhardt explained the application of section 90.403 under these circumstances as follows:
 

 Evidence of conduct or speech of the accused which demonstrates a consciousness of guilt is relevant since it supplies the basis for an inference that the accused is guilty of the offense.
 

 Charles W. Ehrhardt,
 
 Florida Evidence
 
 § 403.1, at 189 (2008 ed.).
 

 Here, Hayward’s thinly disguised attempts to instruct Smith to dispose of the murder weapon, his futile attempts to convey to Smith the statements he had given to the police, and his explosive reaction to Smith’s use of the word “gun” in response to one of his statements were highly relevant to his consciousness of guilt and rebutted his claim that he merely found the gun at the scene. Accordingly, we conclude that the trial court correctly determined that any prejudice caused by Hayward’s extensive use of profanity during his taped conversations with Smith was outweighed by the highly probative value that such evidence offered. Moreover, the jurors were well aware of Hayward’s propensity to use profanity since they previously heard and saw his videotaped statement, which also contained similar profanity.
 

 Although we have concluded that admission of the tapes was not error, even if it had been, such error would have been harmless. Under
 
 DiGuilio,
 
 in conducting a harmless error analysis, the focus is on the effect on the trier of fact. 491 So.2d at 1139. The question to be considered is whether there is a reasonable possibility that the error affected the verdict, with the burden being on the State to demonstrate beyond a reasonable doubt that it did not.
 
 Id.
 
 Given the strength of the evidence connecting Hayward to the crime, we find that there is no reasonable possibility that the profanity used by Hayward during his taped conversations with Smith affected the verdict. Hayward confessed to the burglary of Destefano’s car and confirmed all of the events of the robbery and murder while claiming he was watching someone else do the shooting. McDowell gave testimony of his own eyewitness account, and there was extensive forensic evidence connecting Hayward to the murder.
 

 We also conclude that any impact that the admission of the tapes may have had on the jury during the penalty phase was insignificant and did not affect the jury’s death sentence recommendation. Even if the language used by Hayward portrayed him in a derogatory light, any possible prejudice would have been overshadowed by the significant aggravating circumstances: (1) that the defendant had prior violent felony convictions; and (2) that the murder was committed during the course of a robbery; merged with (3) that it was committed for pecuniary gain. The prior violent felony aggravator has been regarded as one of the weightiest aggrava-tors.
 
 See Jones v. State,
 
 998 So.2d 573, 586 (Fla.2008) (reiterating that the prior violent felony aggravator is one of “the most weighty in Florida’s sentencing calculus” (quoting
 
 Sireci v. Moore,
 
 825 So.2d 882, 887-88 (Fla.2002))). Moreover, in Hayward’s case, the trial court found a complete absence of statutory mitigation
 
 *40
 
 and found only relatively weak nonstatuto-ry mitigation.
 

 Given the evidence of weighty aggrava-tors presented to the jury, there is no reasonable possibility that the manner in which Hayward spoke to his girlfriend and the profanity he used affected the jury’s sentencing recommendation or the trial court’s ultimate decision to sentence Hayward to death. As the trial court noted, “each statutory aggravator, when considered alone, outweighs the totality of the mitigating circumstances” and justifies a sentence of death. Thus, the error, if any, was harmless and relief is denied on the claim.
 

 PROSECUTORIAL COMMENTS
 

 We next address Hayward’s claim that reversible error occurred when the State improperly commented on Hayward’s character and drew a comparison between his worth and that of Destefano. Prior to the commencement of the penalty phase, Hayward moved to prevent or limit the presentation of victim impact evidence before the jury. Among other things, he objected to the use of evidence which “may invite jurors to gauge the relative worth of particular victims’ lives.” When the State agreed to refrain from using any such information to make “characterizations and opinions about ... the defendant,” the trial court denied the defense motions and allowed victim impact statements to be read to the jury. During the victim impact portion of the penalty phase, Destefa-no’s mother talked about how her son had worked hard and saved up to buy a Harley-Davidson motorcycle, which had been his dream.
 

 During the penalty phase closing argument, the prosecutor reminded the jury about how Destefano had worked toward his goal of buying a Harley-Davidson, and then stated, in part, as follows:
 

 One thing we learned about Danny was that Danny set his sights on something and then worked towards that ... goal .... Because he had a goal in mind. And he recognized that choices, you see, choices that he made in his life will take him to his goal. Because in the end, ladies and gentlemen, it all comes down to choices we make. As human beings we have free will. We have the ability to control our destiny. When you make a choice, you may make a choice that is well [intentioned] and bad things happen. And we recognize it that unfortunately you may have to pay the consequences for that. Sometimes you make decisions, good things happen, they turn out the way you want.
 

 Sometimes you make decisions in your life for the wrong reasons but knowing why. Steven Hayward did just that. Steven Hayward sits at this table today not as a result of anything anybody did to him, any of the conditions in his life, but because of very simply he made some choices. He exercised his free will and his free will brings him here today and this places him in this condition of life.
 

 However, no contemporaneous objection was made to this argument.
 

 In order to preserve a claim of improper prosecutorial argument, “[c]oun-sel must contemporaneously object to improper comments.”
 
 Bailey v. State,
 
 998 So.2d 545, 554 (Fla.2008) (quoting
 
 Merck v. State,
 
 975 So.2d 1054, 1061 (Fla.2007)),
 
 cert. denied,
 
 — U.S. -, 129 S.Ct. 2395, 173 L.Ed.2d 1307 (2009). In this case, Hayward failed to make an objection either during or after the prosecutor’s comments concerning the life choices of both Destefano and Hayward. Thus, this issue is unpreserved and fundamental error must be shown for resentencing to be required.
 
 See Simpson v. State,
 
 3 So.3d
 
 *41
 
 1135, 1146 (Fla.2009) (recognizing the general rule that failure to make a contemporaneous objection to improper closing argument “waives any claim concerning such comments for appellate review” unless “the unobjected-to comments rise to the level of fundamental error”) (quoting
 
 Brooks v. State,
 
 762 So.2d 879, 898-99 (Fla.2000)),
 
 petition for cert. filed,
 
 No. 08-10414 (U.S. May 11, 2009). “This is a high burden which requires an error that ‘goes to the foundation of the case or the merits of the cause of action and is equivalent to a denial of due process.’ ”
 
 Bailey,
 
 998 So.2d at 554 (quoting
 
 Johnson v. State,
 
 969 So.2d 938, 955 (Fla.2007)).
 

 Fundamental error is error that “reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.”
 
 Simpson,
 
 3 So.3d at 1146 (quoting
 
 Brooks,
 
 762 So.2d at 898-99). Error during the penalty phase is fundamental if it is “so prejudicial as to taint the jury’s recommended sentence.”
 
 Jones v. State,
 
 949 So.2d 1021, 1037 (Fla.2006) (quoting
 
 Fennie v. State,
 
 855 So.2d 597, 609 (Fla.2003)). We first examine whether the prosecutor’s argument was improper and then turn to the question of whether the improper argument constituted fundamental error.
 

 The prosecutor’s comments were based on victim impact evidence admitted during the penalty phase. Victim impact evidence is admissible, but its purpose is “to demonstrate the victim’s uniqueness as an individual human being and the resultant loss to the community’s members by the victim’s death.” § 921.141(7), Fla. Stat. (2007);
 
 see also Wheeler v. State,
 
 4 So.3d 599, 607 (Fla.2009),
 
 petition for cert. filed,
 
 No. 08-11026 (U.S. May 28, 2009);
 
 Franklin v. State,
 
 965 So.2d 79, 98 (Fla.2007);
 
 Huggins v. State,
 
 889 So.2d 743, 765 (Fla.2004). Section 921.141 specifically states that “[c]haracterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence.” § 921.141(7), Fla. Stat. Hayward argues that the State did not follow the law and improperly used victim impact information to compare the characters and choices of Destefano and Hayward during the penalty phase closing argument. We agree. Although the victim impact evidence itself was proper, the prosecutor’s use of it in his closing argument — comparing the choices made by the victim and those made by Hayward — was improper.
 

 The prosecutor characterized Destefano as a goal-oriented, hard worker who made important choices in his life, followed by a statement that Hayward had also made choices and “Steven Hayward sits at this table today not as a result of anything anybody did to him, any of the conditions in his life, but because of very simply he made some choices.” This is clearly a comparison of the choices made by the victim versus the choices made by Hayward, which is not within the scope of the victim impact statute.
 

 Recently, this Court examined a similar claim in
 
 Wheeler,
 
 where victim impact evidence was used to comment on and compare the choices made by the victim and the defendant. In
 
 Wheeler,
 
 the State made the following comment in closing argument during the penalty phase:
 

 The choices that Jason Wheeler made had a devastating impact on not just the family of Deputy Koester, but his family as well. If you tried to sit and count the number of people that have been affected by what was done, it numbers in the dozens ....
 

 Id.
 
 at 609-10. At this point, defense counsel objected and the trial court warned the prosecutor to make clear he was not arguing victim impact based on the number of
 
 *42
 
 persons affected. The prosecutor then stated:
 

 But you see, the rules tell you that that’s not what you base your decision on. That’s the whole purpose of the process is for you to try to look objectively at the choices that were made and what is the just consequence of those choices.
 

 Id.
 
 at 610. The defense did not object to this comment, or to the following additional comment:
 

 But within all this realm of choicelessness, we do choose how we will live. Either courageously or cowardly, or honorably or dishonorably, with purpose or a drift [sic], we decide what’s important and trivial in life. We decide what makes us significant is either what we do or what we refuse to do.
 

 But no matter how indifferent the entire universe may be to these choices, these choices and decisions are ours to make. We decide. We choose. And as we decide and as we choose, our destinies are formed. That’s what I want you to look at as we walk through this case and these facts and these aggravating and mitigating circumstances.
 

 Id.
 
 (quoting “writer Joseph Epstein”). We concluded in
 
 Wheeler
 
 that these statements constituted prosecutorial error but, as was the case here, no contemporaneous objection was made. We found that the comparison was improper but that the argument did not to rise to the level of fundamental error.
 

 In the instant case, the prosecutor’s statement comparing Destefano’s choices in life to Hayward’s choices are similar to the improper comparisons made by the prosecutor in
 
 Wheeler.
 
 In both instances, the prosecutors improperly used victim impact information to compare the characters and choices of the victims and the defendants. Accordingly, we find that the prosecutor’s statement constituted prosecutorial error in this case. We must now determine whether the conduct was so egregious as to rise to the level of fundamental error requiring resentencing.
 

 Reversal for improper prose-cutorial comment is not automatic,
 
 State v. Murray,
 
 443 So.2d 955, 956 (Fla.1984), and “[i]n the penalty phase of a murder trial, resulting in a recommendation which is advisory only, prosecutorial misconduct must be egregious indeed to warrant our vacating the sentence and remanding for a new penalty-phase trial.”
 
 Bertolotti v. State,
 
 476 So.2d 130, 133 (Fla.1985). In this case, because Hayward failed to make a contemporaneous objection to the erroneous argument, he must also demonstrate the error is fundamental; that is, he must demonstrate that the error “reaches down into the validity of the trial itself’ and that a sentence of death “could not have been obtained without the assistance of the alleged error.”
 
 Simpson,
 
 3 So.3d at 1146 (quoting
 
 Brooks,
 
 762 So.2d at 898-99). In determining whether fundamental error has occurred, we review the totality of the circumstances.
 
 Power v. State,
 
 886 So.2d 952, 963 (Fla.2004). Having reviewed the improper prosecutorial comments in the context of the entire closing argument and in light of the evidence presented in the penalty phase, we conclude that the improper prosecutorial comments in this case do not rise to the level of fundamental error. Given the strength of the evidence against Hayward and the gravity of the aggravators, we cannot say that the jury would not have recommended a death sentence or that the trial court would not have imposed a death sentence if the prosecutor had not made the improper victim impact comparison.
 

 However, we feel compelled to once again voice our disapproval of this type of prosecutorial comment comparing
 
 *43
 
 the life or choices of the victim with that of the defendant. The misconduct was exacerbated by the prosecutor’s acknowledgment immediately prior to the commencement of the penalty phase of the impropriety of the use of victim impact evidence in such a manner. Despite his agreement to refrain from using victim impact evidence to make “characterizations and opinions about ... the defendant,” the prosecutor proceeded to needlessly stain the record with the clearly improper remarks. As we did in
 
 Wheeler,
 
 we again hold that victim-defendant comparisons are improper and again “caution the State and its prosecutors to remain mindful of the limited purpose for which victim impact evidence may be introduced and to stay strictly within those parameters.”
 
 Wheeler,
 
 4 So.3d at 611.
 

 CONSTITUTIONALITY OF FLORIDA’S SENTENCING SCHEME
 

 Hayward has also challenged Florida’s sentencing scheme as unconstitutional, making three claims: (1) imposition of the death penalty based on an eight-to-four jury recommendation is unconstitutional; (2) the standard jury instruction for premeditation is insufficient; and (3) the United States Supreme Court’s decision in
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), does not allow a system in which the jury may render an advisory nonunanimous verdict. We address each claim in turn.
 

 Hayward asserts that section 921.141, Florida Statutes (2008), Florida’s capital sentencing statute, does not authorize a bare majority advisory sentence and that a bare majority jury recommendation of death is unreliable, thereby depriving him of due process.
 
 [13]
 
 Hayward’s claim has no merit for two reasons. First, section 921.141(3) makes specific reference to a sentencing recommendation by “a majority of the jury,” and we have previously recognized that Florida’s capital sentencing statute “allows the death penalty to be imposed even though the penalty-phase jury may determine by a mere majority vote” whether to recommend death.
 
 State v. Steele,
 
 921 So.2d 538, 550 (Fla.2005). Second, Hayward has provided the Court with no basis on which to find that the capital sentencing statute results in an unreliable or unconstitutional penalty. Therefore, Hayward’s claim that his sentence is unconstitutionally unreliable is without merit and relief is denied on this claim.
 

 Hayward also asserts that the standard instruction for premeditated murder fails to properly inform the jury about the required “premeditated design” and that there must be proof of deliberation both before and at the time of the killing. At trial, without objection from Hayward, the jury was provided with the standard jury instruction for first-degree premeditated murder. Thus, this issue has not been preserved for appeal.
 
 Overton v. State,
 
 801 So.2d 877, 901 (Fla.2001) (“Issues pertaining to jury instructions are not preserved for appellate review unless a specific objection has been voiced at trial.”). However, even if the issue had been preserved, Hayward would not be entitled to relief because this Court has upheld the standard jury instructions on premeditated murder.
 
 See, e.g., Kilgore v. State,
 
 688 So.2d 895, 898 (Fla.1996) (“[T]he standard jury instructions are sufficient, to explain premeditation.”);
 
 Spencer v. State,
 
 645 So.2d 377 (Fla.1994) (holding that the standard first-degree murder instruction ad
 
 *44
 
 dresses all of the points discussed in
 
 McCutchen
 

 [14]
 

 and properly instructs the jury about premeditated design). Because we have previously rejected this same claim and found the standard instruction sufficiently instructs the jury as to premeditated design, this claim is without merit.
 

 As his last constitutional challenge, Hayward contends that Florida’s capital sentencing scheme under section 921.141, Florida Statutes, is unconstitutional based on
 
 Ring
 
 because it does not require that the finding of aggravators be made by a unanimous jury. He concedes that this Court has held the statute constitutional in the face of the same challenge but asks the Court to revisit its rulings.
 

 In this case, the trial court found in aggravation that Hayward had previously been convicted of three prior violent felonies (the 1988 second-degree murder and two armed robberies). We have “repeatedly held that where a death sentence is supported by the prior violent felony aggravating factor, as is the case here, Florida’s capital sentencing scheme does not violate
 
 Ring.” Peterson v. State, 2
 
 So.3d 146, 160 (Fla.2009),
 
 petition for cert. filed,
 
 No. 09-5057 (U.S. June 25, 2009). Therefore, Hayward’s challenges to Florida’s capital sentencing scheme are without merit.
 

 SUFFICIENCY OF THE EVIDENCE
 

 Hayward has specifically challenged the sufficiency of evidence as to identification, premeditation, and whether a robbery was actually accomplished.
 
 [15]
 
 Even if Hayward had not challenged the sufficiency of evidence, this Court has a mandatory obligation to review it in every case in which a sentence of death has been imposed regardless of whether the appellant has challenged the evidence.
 
 See Jones v. State,
 
 963 So.2d 180, 184 (Fla.2007); Fla. R.App. P. 9.142(a)(6). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.”
 
 Simmons v. State,
 
 934 So.2d 1100, 1111 (Fla.2006) (quoting
 
 Bradley v. State,
 
 787 So.2d 732, 738 (Fla.2001)).
 

 “[I]f the State’s evidence is wholly circumstantial, not only must there be sufficient evidence establishing each element of each offense, but the evidence must also exclude the defendant’s reasonable hypothesis of innocence.”
 
 Pagan v. State,
 
 830 So.2d 792, 803(Fla.2002). Nonetheless, contrary to Hayward’s assertion, the evidence in his case was not purely circumstantial. Thus, it is unnecessary to apply the special standard of review applicable to circumstantial evidence cases and unnecessary to require the State to disprove Hayward’s hypothesis that he was merely an observer. Moreover, even if this case were purely circumstantial, we would find that Hayward’s hypothesis of innocence was disproven by competent, substantial evidence.
 

 
 *45
 
 The evidence showed that Des-tefano told his assailant, “I don’t have no more,” after which Destefano was brought to his knees by a shot from a
 
 .22
 
 caliber revolver. Then, while standing above him, the assailant took aim again and shot a second time into Destefano’s chest. Des-tefano told the police officer he shot at his assailant with his larger .357 caliber revolver and McDowell testified he heard two gunshots followed by a louder gunshot and saw the assailant examine his bleeding hand under a streetlight. Hayward suffered a gunshot wound that same morning. Destefano also told the officer that he did not know what happened to his revolver. Shortly after the murder, Hayward sold a silver revolver that matched the description of Destefano’s revolver. Additionally, Hayward had a bloody ten-dollar bill in his possession on the morning after the murder. Finally, Destefano himself told the police officer that he had been robbed.
 
 [16]
 
 This evidence establishes not only a robbery by the taking of Destefano’s money at gunpoint, i.e., by “use of force, violence, assault, or putting in fear,”
 
 [17]
 
 but it also establishes a premeditated intent to kill by the assailant.
 
 [18]
 

 As to identity, Hayward took the stand at trial and admitted that he was the person McDowell saw searching Destefano’s car. However, his admitted search of the victim’s vehicle cannot explain the presence of the large amount of Hayward’s blood found on Destefano’s pants. Indeed, bloodstains were found on the pants in many varied patterns: spattered horizontally, “dripped” from above, and “wiped” or crushed into the fabric of Destefano’s back pockets. Nor can the presence of Hayward’s blood on Destefano’s pants be attributed to a careless police officer handling the evidence. Further, given Hayward’s multiple versions of what happened, the jury reasonably discounted his “other robber theory.” Taken together, this provided competent, substantial evidence of identity and rebutted Hayward’s theory of innocence.
 
 [19]
 
 Therefore, we conclude the
 
 *46
 
 evidence is sufficient to support the convictions in this case.
 

 PROPORTIONALITY
 

 Although Hayward does not assert that the sentence is disproportionate, we review every death sentence for proportionality “regardless of whether the issue is raised on appeal.”
 
 England v. State,
 
 940 So.2d 389, 407 (Fla.2006); see
 
 also
 
 Fla. R.App. P. 9.142(a)(6). In reviewing proportionality, the Court follows precedent that requires that the death penalty be “reserved only for those cases where the most aggravating and least mitigating circumstances exist.”
 
 Terry v. State,
 
 668 So.2d 954, 965 (Fla.1996). Therefore, in deciding whether death is a proportionate penalty, the Court makes “a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.”
 
 Anderson v. State,
 
 841 So.2d 390, 407-08 (Fla.2003) (citations omitted). Accordingly, the Court considers the totality of the circumstances and compares the case with other similar capital cases.
 
 See Duest v. State,
 
 855 So.2d 33 (Fla.2003). This analysis “is not a comparison between the number of aggravating and mitigating circumstances.”
 
 Porter v. State,
 
 564 So.2d 1060, 1064 (Fla.1990). Rather, this entails “a
 
 qualitative
 
 review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.”
 
 Urbin v. State,
 
 714 So.2d 411, 416 (Fla.1998).
 

 Further, in a proportionality analysis, this Court will accept the weight assigned by the trial court to the aggravating and mitigating factors.
 
 See Bates v. State,
 
 750 So.2d 6, 12 (Fla.1999). We “will not disturb the sentencing judge’s determination as to ‘the relative weight to give to each established mitigator’ where that ruling is ‘supported by competent substantial evidence in the record.’ ”
 
 Blackwood v. State, 111
 
 So.2d 399, 412-13 (Fla.2000) (quoting
 
 Spencer v. State,
 
 691 So.2d 1062, 1064 (Fla.1996)).
 

 The jury recommended death by an eight-to-four vote. The trial court found in aggravation: (1) prior violent felony (based on three prior violent felonies including second-degree murder) which was given great weight; and (2) that the murder was committed while Hayward was engaged in a robbery, which was merged with the pecuniary gain aggravator and given great weight. These aggra-vators were weighed against eight nonstat-utory mitigating factors which were given very little to some weight: (1) Hayward could have gotten a life sentence (very little weight); (2) he grew up without a father (some weight); (3) he was loved by his family (little weight); (4) he had academic problems (little weight); (5) he obtained a GED in prison (little weight); (6) he would make a good adjustment to prison (little weight); (7) he had financial stress at the time of the crime (little weight); and (8) he had some capacity for rehabilitation (little weight).
 

 This Court has found the death sentence proportionate in other shooting deaths with similar aggravation and mitigation. In
 
 Consalvo v. State,
 
 697 So.2d 805, 820 (Fla.1996), the Court affirmed the death sentence where the aggravators were that the murder was committed during the course of a burglary and to avoid escape. These aggravators were weighed against some nonstatutory mitigation. In
 
 Miller v. State,
 
 770 So.2d 1144, 1150 (Fla.2000), the Court upheld the death sentence where it found a prior violent felony and that commission of the murder occurred during a robbery, which were weighed against ten nonstatutory mitigators. In
 
 *47
 

 Lebron v. State,
 
 982 So.2d 649 (Fla.2008), the gunshot murder was committed during the course of a robbery. The jury recommended death by a vote of seven to five and the trial court found in aggravation that Lebrón had a prior violent felony and that the murder was committed during a robbery and for financial gain. The court found seven nonstatutory mitigators, which were given “very little weight” to “some weight.” Because the mitigation in
 
 Le-brón
 
 was not substantial and was far outweighed by the significant aggravation, just as in the instant case, this Court found the death sentence proportionate and affirmed.
 
 Id.
 
 at 668. Similarly, we conclude that the death sentence in this case is proportionate and affirm.
 

 CONCLUSION
 

 For all the foregoing reasons, we affirm Hayward’s convictions for first-degree murder, robbery with a deadly weapon, burglary of a conveyance while armed, and possession of a firearm by a convicted felon.
 
 [20]
 
 We also affirm his sentence of death.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const.
 

 [2]
 

 . Destefano was of Italian descent with dark olive skin.
 

 [3]
 

 . Destefano's fiancée testified that Destefano's gun was silver.
 

 [4]
 

 . In
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that any statements made in response to interrogation by a defendant in police custody would be admissible at trial only if the defendant was informed of the right to consult with an attorney before and during questioning and of the right against self-incrimination prior to questioning by police, and the defendant understood these rights and voluntarily waived them. Hayward does not claim that the interview statements admitted into evidence were obtained in violation of the requirements of
 
 Miranda.
 

 [5]
 

 . Blood transfers or wipes on fabric are usually highly concentrated. This can occur, for example, when a person presses a bloody object, such as a hand, against the fabric, in essence crushing large quantities of blood into the fabric.
 

 [6]
 

 . In
 
 Ring,
 
 the Supreme Court held that a defendant has a Sixth Amendment right to have a jury find all facts upon which the Legislature conditions an increase in the maximum punishment.
 
 See
 
 536 U.S. at 589, 122 S.Ct. 2428.
 

 [7]
 

 . The State also argues that the common law doctrine of forfeiture by wrongdoing allows the introduction of statements by a witness if the witness is unavailable to testify due to the "means or procurement” of the defendant.
 
 See Giles v. California,
 
 - U.S. -, -, 128 S.Ct. 2678, 2683, 171 L.Ed.2d 488 (2008). The State urges us to hold that forfeiture applies in Hayward's case because he "procured” Destefano's absence by killing him. We decline to adopt such a theory.
 

 [8]
 

 . We have determined that Destefano’s statement did not constitute a dying declaration. Therefore, we need not address whether a dying declaration might be an exception to the Confrontation Clause requirements set forth in
 
 Crawford.
 

 [9]
 

 . Of course, constitutional errors committed prior to an official arrest cannot be “cleansed” by the simple remedy of administering
 
 Miranda
 
 warnings later.
 
 See, e.g., Brown v. Illinois,
 
 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (subsequent
 
 Miranda
 
 warnings do not cure Fourth Amendment violations). However, since we have found no constitutional violations in the admission of evidence obtained pursuant to Hayward’s police encounter at the rooming house prior to his being given such warnings, there was no violation and thus no need for any “cleansing.”
 

 [10]
 

 . Hearsay can be used to establish probable cause to arrest, even if it may not be used at trial.
 
 See Gerstein v. Pugh,
 
 420 U.S. 103, 120, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (discussing the standards of proof in various types of detentions and stating that for probable cause to arrest, hearsay may be utilized). Further, Hayward objected only to Officer Grecco's description of the attacker, not to Destefano’s statement that he hád shot at his attacker.
 

 [11]
 

 . Hayward does not contend that the calls were illegally intercepted, only that their prejudicial effect outweighed any probative value.
 

 [12]
 

 . The police had already searched Smith's apartment.
 

 [13]
 

 . Even though Hayward recognizes that the jury in this case recommended death by a vote of eight to four, which is not a "bare majority,” he contends his advisory verdict was unreliable for the same reasons he argues that a “bare majority” verdict is unreliable.
 

 [14]
 

 .
 
 McCutchen v. State,
 
 96 So.2d 152, 153 (Fla.1957) (holding that a premeditated design to effect the death of a human being is a fully formed and conscious purpose to take human life, formed upon reflection and deliberation, entertained in the mind before and at the time of the homicide and that if the party at the time was fully conscious of a settled and fixed purpose to take the life of a human being, and of the consequences, the intent or design would be premeditated within the meaning of the law).
 

 [15]
 

 . The conviction of robbery was utilized in finding an aggravator and was the underlying felony for the charge of first-degree felony murder.
 

 [16]
 

 . Hayward did
 
 not
 
 object to Destefano’s statement to the police officer concerning the fact that he had been robbed, but only challenged that portion of Destefano’s statement concerning the description of the assailant. At trial, Hayward’s attorney stated:
 

 We have no objection to that he was shot, where he was shot, that he was robbed, that he was delivering papers, that his car is down the street. We don’t contest any of that. It’s all true, so even if I had a legal objection, we’re not — it's the identification of the perpetrator as being a black male wearing a stocking cap. That's still — we’re limiting our objection to those two statements.
 

 [17]
 

 . Section 812.13, Florida Statutes, defines robbery as follows:
 

 (1) "Robbery” means the taking of money or other property which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear.
 

 § 812.13(1), Fla. Stat. (2008).
 

 [18]
 

 . This Court stated in
 
 Larry v. State,
 
 104 So.2d 352, 354 (Fla.1958), that "[ejvidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.”
 

 [19]
 

 . However, even if premeditation had not been proven, the conviction would still be proper under felony murder as there is factual support for that theory of prosecution and the jury in Hayward's case was instructed on both premeditated and felony murder.
 
 See Mungin v. State,
 
 689 So.2d 1026, 1030 (Fla.1995) (even if there is or could be error on one theory, if another theory of murder is factually supported, there is no need for reversal).
 

 [20]
 

 . Although Hayward does not separately challenge his convictions for burglary of a conveyance while armed and possession of a firearm by a convicted felon, we find sufficient evidence to affirm those convictions as well.