NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

ASAD KHAN, )
)
        Appellant, )
)
v. )    Case No. 2D16-5288
)
STATE OF FLORIDA, )
)
        Appellee. )
_____ )

Opinion filed April 6, 2018.

Appeal from the Circuit Court for Lee
County; Thomas Reese, Judge.

Spencer Cordell of Law Office of Spencer
Cordell, Fort Myers, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee; Cornelius C. Demps,
Assistant Attorney General; and Jason M.
Miller, Assistant Attorney General, Tampa,
for Appellee.

LUCAS, Judge.

        Asad Khan appeals his judgment and sentence for robbery with a deadly

weapon. § 812.13, Fla. Stat. (2015). He raises two issues on appeal. Finding merit in

his arguments, we reverse the circuit court's judgment and sentence and remand his case for a new trial.

Shortly after midnight, on March 2, 2015, a man with some kind of a black cloth around his face entered a 7-Eleven convenience store in Fort Myers, held a knife to the clerk's neck, and robbed the store of all the cash in the registers. The clerk, although unhurt, was obviously distraught. When first interviewed by Lee County Sheriff's Office detectives, she could only identify the robber as a man with "medium brown" skin who stood about six feet, two inches in height and spoke with an "Indian" or "Middle Eastern" accent.

Utilizing surveillance video footage obtained from both the 7-Eleven and a Speedway convenience store across the street, and with the assistance of a knowledgeable employee at a local Car Max auto dealership, detectives were able to identify the make and model of the vehicle that the robber had driven to and from the scene. Its license tag was indecipherable (because of where the vehicle was parked), but it was determined that the vehicle was a Volkswagen Routan van. Lee County Sheriff's Detective Sean Mukaddam then reviewed the State Driver and Vehicle Identification Database (DAVID) to cross-reference Lee County registrations for Routans that might reflect a Middle Eastern family surname. The only match, he concluded, was a Routan registered to one Attia Mobeen—who, as it turned out, was Mr. Khan's wife.[1]

While detectives developed their investigation, a local television station began airing a brief clip of the robbery taken from the 7-Eleven surveillance video. Two

---

[1]Both Mr. Khan and Ms. Mobeen are of Pakistani descent.

former coworkers of Mr. Khan's, Messrs. Harris and Soperak, believed they recognized Mr. Khan as the robber depicted in the video based upon what could be seen of the man in the footage—and on what they described as the man's peculiar gait.[2] They contacted the television station's "Crime Stoppers" phone number and were put in touch with the sheriff's office's investigators. In addition to identifying Mr. Khan in the video, both Mr. Harris and Mr. Soperak corroborated Mr. Khan's general, physical description, his manner of speech (which was described as an "Indian" or "Middle Eastern" accent), that Mr. Khan sometimes drove a Volkswagen Routan van, and that he had stopped at this particular 7-Eleven in the past.

Armed with this information, detectives obtained search warrants for Mr. Khan's home, his DNA, and Ms. Mobeen's Routan. They found nothing of interest in the house and were unable to match Mr. Khan's DNA or fingerprints to anything meaningful in the case. They seized the van from a repair shop. In it, they discovered a black hijab headscarf as well as a bag of cash.[3] Mr. Khan was then taken into custody and interviewed by Detective Mukaddam. The interview was video recorded, but the recording abruptly ceased, apparently the moment before Mr. Khan was given a Miranda[4] warning. From what we can glean of this brief interchange between Mr. Khan and Detective Mukaddam, it appears that Mr. Khan was in custody for the entire

---

[2]A copy of the surveillance video was not included in our record, but at trial, Mr. Khan's walk was described by these witnesses as a unique kind of "swagger" with his "feet landing outwards when he walks."

[3]Ms. Mobeen would later testify at her husband's trial that the cash was from tips she had received at her job and the hijab belonged to the couple's daughter.

[4]Miranda v. Arizona, 384 U.S. 436 (1966).

duration of the interview and had exercised his right to remain silent within a few minutes of its commencement.

The focal point of Mr. Khan's jury trial revolved around the identity of the robber. The State maintained it was Mr. Khan; Mr. Khan argued it was someone else. In presenting its case, the State introduced the evidence described above, including a detailed description by Detective Mukaddam of the DAVID research that led his investigation to Mr. Khan's wife's van. When the defense objected on hearsay grounds to Detective Mukaddam relaying his investigative inquiries and what he had read in DAVID to the jury, the State responded, alternatively, that the information was not being offered for its truth, but rather to explain the progression of the robbery's investigation, and that the information in DAVID was simply "data" (which, presumably, made it admissible, according to the State). The circuit court expressed misgivings, but allowed the testimony. The State also played a portion of the videotaped interview between Mr. Khan and Detective Mukaddam for the jury, representing to the court that it was for the limited purpose of identifying Mr. Khan's voice and accent.

Mr. Khan elected to testify in his defense. During direct examination, he denied having even entered that 7-Eleven on the night of the robbery. He explained that he had driven his wife's van to the Speedway convenience store across the street from the 7-Eleven to buy cigarettes that night. Before he could reach that store, though, he recalled accidentally driving his wife's van into a ditch (because, he claimed, he had been drinking at an earlier birthday party). According to Mr. Khan, some passersby stopped to help him pull his van out of this ditch, whereupon Mr. Khan continued on to the Speedway to purchase his cigarettes before returning home. While at the

- 4 -

Speedway, Mr. Khan recalled that that store's clerk and some patrons expressed concern to Mr. Khan about his now-smoking automobile. When the State cross-examined Mr. Khan on this testimony, the following exchange ensued:

> Q. So these are people who saw you at the Speedway very shortly before midnight on the night of the robbery with the wrecked car?
>
> A. They seen me on the night of my daughter's birthday at the Speedway gas station with a car that was smoking, and had front end damage.
>
> Q. Why didn't you tell Detective Mukaddam to go talk to them, why not?
>
> A. He never came and asked me.

Defense counsel immediately moved for a mistrial on the ground that the State's last question constituted an impermissible comment on Mr. Khan's right to remain silent. In response, the State pointed out that Mr. Khan had spoken, albeit briefly, to Detective Mukaddam during the prior investigatory interview. The assistant state attorney appeared to acknowledge "it was an inadvertent question that was asked," but since there had been a prior conversation between Detective Mukaddam and Mr. Khan, the question's reference would not necessarily have been to Mr. Khan's silence after he had been given his Miranda warning. The circuit court recognized that it was a "close" question, but denied the defense's motion. The defense did not request, nor did the court give, any curative instruction to the jury.

At the conclusion of the trial, the jury returned a guilty verdict. The circuit court adjudicated Mr. Khan guilty and sentenced him to five years in prison, followed by five years of probation. This is Mr. Khan's appeal of that judgment and sentence.

Mr. Khan raises two issues for our consideration. First, he contends that the circuit court reversibly erred when it allowed the State to introduce, over his hearsay objection, the details of Detective Mukaddam's investigation, including his statements about what the DAVID database revealed. "A trial judge's ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion." Hayward v. State, 24 So. 3d 17, 29 (Fla. 2009). That discretion, however, must be exercised within the constraints of the rules of evidence and principles of stare decises. Id. Second, Mr. Khan argues that the court should have granted his motion for mistrial following the State's improper reference to Mr. Khan's Fifth Amendment right to remain silent. With respect to Mr. Khan's second issue, the Florida Supreme Court has explained that "any comment which is 'fairly susceptible' of being interpreted as a comment on silence will be treated as such." State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986). An appellate court must then apply a harmless error analysis to the "fairly susceptible comment" at issue. Id. at 1136. Thus, regardless of whether there was "overwhelming evidence of guilt," an impermissible comment on a defendant's right to remain silent can only be affirmed if the State can "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict." Ventura v. State, 29 So. 3d 1086, 1089 (Fla. 2010) (emphasis omitted) (quoting DiGuilio, 491 So. 2d at 1136, 1138-39).

We begin with the evidentiary issue. Allowing Detective Mukaddam to relay at length his entire investigative process and everything he had read in DAVID that eventually led him to Mr. Khan was erroneous in this case. Plainly, this line of testimony, including the recital to the jury that the driver registration information in DAVID reflected only one "Middle Eastern" sounding owner of a Volkswagen Routan in

- 6 -

Lee County—who was Mr. Khan's wife—was hearsay offered to buttress the State's claim that Mr. Khan was the robber who had driven a vehicle of the same make and model near the 7-Eleven. See § 90.801(1)(c), Fla. Stat. (2015); Keen v. State, 775 So. 2d 263, 274 (Fla. 2000) (holding that detective's testimony about the "sequence of events" in his investigation that led to the defendant's arrest was impermissible hearsay, and noting that "[w]hen the only possible relevance of an out-of-court statement is directed to the truth of the matters stated by a declarant, the subject matter is classic hearsay even though the proponent of such evidence seeks to clothe such hearsay under a nonhearsay label"). And it was a particularly pernicious kind of hearsay in the context of a criminal prosecution. As the Fourth District observed:

> In spite of substantial authority condemning this attempt to adduce prejudicial hearsay, the [S]tate often persists in offering this kind of hearsay to explain the "state of mind" of the officer, or to explain a logical sequence of events during the investigation leading up to an arrest. This type of testimony occurs with the persistence of venial sin. The [S]tate's insistence on attempting to adduce this particular brand of hearsay requires trial judges to be constantly on their guard against it. . . . [A] "police officer's state of mind is generally not a material issue in a criminal prosecution."

Saintilus v. State, 869 So. 2d 1280, 1282 (Fla. 4th DCA 2004) (quoting State v. Baird, 572 So. 2d 904, 907 (Fla. 1990)). Because the State failed to establish an applicable hearsay exception, the State should not have been allowed to elicit this hearsay through the detective's testimony.[5]

_____

[5]In its answer brief, the State also urges us to consider the applicability of sections 90.803(6) or (8), Florida Statutes (2015), granting hearsay exceptions for business records or public records respectively, to the detective's testimony about his investigation with DAVID. We are not persuaded that the DAVID records in this case could qualify as a hearsay exception under section 90.803(6) because nothing in the record before this court would permit us to conclude that the business records hearsay

- 7 -

More troubling is the question the State posed to Mr. Khan during his cross-examination. The State challenged Mr. Khan as to why he never relayed to Detective Mukaddam—the detective who arrested Mr. Khan—any details about the people Mr. Khan claimed would have seen him at the Speedway on the night of the robbery. The question that was posed to Mr. Khan by the State was more than "fairly susceptible" to being construed as a comment on Mr. Khan's prior silence while in custody; the whole point of the question was to highlight the fact that Mr. Khan had remained silent following his arrest and brief interview with Detective Mukaddam.

We find the supreme court's decision in State v. Hoggins, 718 So. 2d 761 (Fla. 1998), controlling here. In Hoggins, a man armed with a gun entered a convenience store, threatened to kill the clerks who were working, and stole a cash register drawer and cigar box filled with lottery tickets. Id. at 762. Later that same evening, police officers found and pursued a suspect they observed carrying a cash

exception would have been applicable. See Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010) ("Under the tipsy coachman doctrine, where the trial court 'reaches the right result, but for the wrong reasons,' an appellate court can affirm the decision *only* if 'there is any theory or principle of law *in the record* which would support the ruling.' " (first emphasis added) (quoting Robertson v. State, 829 So. 2d 901, 906 (Fla. 2002))). So, too, we have significant reservations that the record before us would render this testimony admissible under the public records hearsay exception. But even assuming that the DAVID records could have qualified as a public records exception under section 90.803(8), Detective Mukaddam's testimony about the records' content would still remain inadmissible hearsay for which there was no exception. See, e.g., Holborough v. State, 103 So. 3d 221, 222–23 (Fla. 4th DCA 2012) (concluding that testimony from the investigating officer that he identified the victim based on a Florida ID was inadmissible hearsay because "[e]ven if the ID qualified as a public record for the purpose of the section 90.803(8) exception to the hearsay rule for public records, the officer's in-court testimony about what the ID said was hearsay falling under no exception"); Tillman v. State, 964 So. 2d 785, 787-789 (Fla. 4th DCA 2007) (concluding officers' testimony regarding the contents of BOLOs and that appellant and his vehicle matched the description of the person suspected for the armed kidnapping described therein was prejudicial and inadmissible hearsay).

register drawer and cigar box on his bicycle. Id. Following a trail of lottery tickets and food stamps, the officers eventually found the defendant hiding in an apartment where they arrested him. Id. at 762-63. When his case went to trial, Mr. Hoggins testified that he was neither the robber nor the man police had chased on the bicycle; instead, he testified he had been sitting on the apartment porch when he saw "someone hide something" in a nearby playground. Id. at 763. He went to investigate and found the register drawer and cigar box, which he took back to the apartment—which, he claimed, was why he had the store's stolen property. Id.

At trial, Mr. Hoggins testified in his defense and relayed the foregoing account about how he happened across a cash register drawer and cigar box in a playground. Id. The State on re-cross examination put it to Mr. Hoggins: "[W]hen you were in the upstairs bedroom and the police came up there, you never gave them the version that you have just given us today?" Id. Mr. Hoggins admitted he had not and was found guilty. Id. Approving the Fourth District's reversal of his judgment and conviction and answering a certified question from that court, the Hoggins court distinguished between a defendant's prearrest and postarrest silence with respect to permissible cross-examination impeachment. Id. at 765-69. Using postarrest silence to impeach a testifying defendant, the court held, violated article I, section 9 of the Florida Constitution, "regardless of whether Miranda warnings [had] been given." Id. at 770.[6]

---

[6]In fashioning this distinction, the court explained that Florida courts do not recognize a defendant's election to testify in his or her defense as a waiver of a prior exercise of postarrest, pre-Miranda silence. Hoggins, 718 So. 2d at 769. Moreover, the court was troubled by the prospect of "treating differently defendants who are aware of their Miranda rights and those who are not." Id. at 770.

Here, the only pertinent interaction Mr. Khan ever had with Detective Mukaddam was when Mr. Khan was in custody and under arrest. The question—"why didn't you tell Detective Mukaddam to go talk to" the clerk and patrons who, Mr. Khan claimed, saw his smoking car on the night of the robbery—referenced the very postarrest, pre-Miranda silence Hoggins held was constitutionally impermissible. And, indeed, it appears that that reference may have been readily understood as a query into Mr. Khan's silence, since at the conclusion of Mr. Khan's testimony, one juror sought to pose the follow-up question: "Did the defense get written testimony from the clerk at Speedway whom the defendant claimed witnessed the damage to the van and the smoke coming from it? If not, why not?"

> [C]omments on silence are high risk errors because there is a substantial likelihood that meaningful comments will vitiate the right to a fair trial by influencing the jury verdict and that an { "pageset": "S11 appellate court, or even the trial court, is likely to find that the comment is harmful under Chapman[ v. California, 386 U.S. 18 (1967)].

DiGuilio, 491 So. 2d at 1136-37. From our review of this record, we have no hesitation concluding that the State's question to Mr. Khan about his silence while in custody was both improper and harmful. Accordingly, we reverse his final judgment and sentence and remand his case for a new trial.

Reversed and remanded.

SILBERMAN and CRENSHAW, JJ., Concur.