DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**MICHAEL D. JONES,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-3691

[May 26, 2021]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit; Dan L. Vaughn, Judge; L.T. Case No. 312014CF000789A.

Carey Haughwout, Public Defender, and Gary Lee Caldwell, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Marc B. Hernandez, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

Michael Jones appeals his conviction for first-degree murder. We affirm the conviction and write primarily to address (1) the admissibility of evidence of a domestic violence situation that preceded the murder and (2) the application of the excited utterance exception to the rule against hearsay to admit certain statements by the victim after the domestic violence incident.

### *The Charge*

Appellant was charged with first-degree premeditated murder for the death of his girlfriend, Diane Duve. The State alleged that appellant strangled the victim and stuffed her body in the trunk of her car, which he abandoned in a parking lot.

### *Evidence at Trial as to the Victim's Murder in June 2014*

The victim was last seen leaving a bar in Vero Beach with appellant at around 1:13 a.m. on June 20, 2014. The bar was about four miles from

appellant's townhouse. Around 1:45 a.m., the victim texted her mother and told her that she would not be home.

Appellant, who was employed as a wealth planner, called in sick to work on June 20th. Shortly after noon that day, a friend of appellant's gave him a ride to his car, which was still in the parking lot of the Vero Beach bar where he had been with the victim the night before. Appellant told the friend that the previous night started out well, but the last ten minutes "weren't that great."

Later that afternoon, appellant withdrew $2,500 from the bank and told the teller that he was going on vacation.

Meanwhile, the victim's mother grew concerned because the victim had not responded to her calls and texts. Around 5:30 p.m. on June 20th, the victim's mother called appellant, who later returned her call and told her that the victim was sleeping. Appellant said the victim would call her back, but she never did.

That evening, appellant checked into a hotel in Fort Pierce. He paid in cash and asked the clerk not to transfer any calls to him or tell anyone that he was there.

Around 6:00 a.m. the next day, June 21, appellant's neighbor saw a man with an "odd" or "freaked out" demeanor walking behind appellant's building. The neighbor then saw a black Nissan Altima—the victim's car—back out of appellant's garage. Police later found the victim's blood in appellant's garage.

Around 7:00 a.m. on June 21, surveillance footage from a Palm Bay Walmart captured appellant getting out of a black car and entering the store. Appellant bought a Samsung flip phone and a prepaid Verizon card. He then drove the black car to the dumpster area behind the Walmart. He got out to throw away a trash bag, but the dumpsters were locked and he drove off.

About an hour later, appellant used the Samsung phone to call for a taxi. A taxi driver picked up appellant in Melbourne, drove him to Vero Beach, and dropped him off across the street from his home. The taxi driver then saw appellant get into a gold car.

Police obtained appellant's cell phone records, which showed that he had traveled from Vero Beach to Palm Bay to Melbourne, back to Vero Beach, and then to Fort Pierce. Police arrested appellant at the hotel in

Fort Pierce on June 22. Appellant had both an iPhone and a Samsung flip phone in his possession. Police also collected clothing from appellant that matched the clothes he was wearing in the Walmart surveillance video.

The next day, June 23, police discovered the victim's car in a parking lot in Melbourne, near where the taxi had picked up appellant. The victim's body was in the trunk of her car.

The medical examiner who conducted the autopsy testified that the manner of death was homicide and that the cause of death was manual strangulation. He explained that the victim had defensive wounds and that the strangulation would have taken four to six minutes before death occurred. The medical examiner's conclusion that the victim had died of manual strangulation was based on the following factors: (1) the pattern of bruising associated with decomposition; (2) the fingerprint impressions in the neck; (3) the fingernail impressions to the neck; (4) the bleeding in the eyes; (5) the biting of the tongue; (6) internal hemorrhaging in the neck; and (7) multiple broken bones in the neck, including broken hyoid bones.

### *Williams* Rule Evidence

Before trial, the State filed a notice of intent to introduce *Williams*[1] rule evidence that, on April 30, 2014, less than two months before the murder, appellant had choked the victim and threatened her. The State contended that the evidence was relevant for the purpose of showing "proof of motive, intent, knowledge, and/or absence of mistake or accident," as well as "premeditation, identity or the rebuttal of any proposed defense or defenses." The State later abandoned its argument that the evidence was being offered to prove identity.

The trial court held a *Williams* rule hearing. At the hearing, the State presented the following evidence regarding the April 30th incident.

A. Appellant's Neighbor's Testimony

Appellant's neighbor testified that he called 911 in the early morning hours of April 30, 2014, after hearing appellant having a loud, one-sided argument with the victim for about 45 minutes to an hour. Appellant was enraged and the situation sounded extremely unsafe. In the 911 call, the neighbor reported that appellant was "trying to dominate the crap out of her," but that the argument was verbal and he could not "hear any slaps or anything."

---

[1] *Williams v. State,* 110 So. 2d 654 (Fla. 1959).

B. Officer Kuehn's Testimony

Officer Kuehn testified that he arrived at appellant's home at 1:16 a.m. on April 30th to investigate a disturbance. When Officer Kuehn knocked on the door, it took several minutes before appellant answered. Appellant said something to the effect that he had been asleep. Officer Kuehn asked to see the victim, and she came to the door.

The victim was wearing a tank top and pajama pants. Officer Kuehn got a good look at the victim and did not see any marks on her. The victim's demeanor appeared normal and she was not crying. Officer Kuehn had the victim speak with Officer Brumley, and then they switched and Officer Kuehn spoke to her. Eventually, the victim said she wanted to leave, so the officers stayed on the scene while the victim collected her belongings and left. Officer Kuehn was at the scene for about 15 to 20 minutes after first encountering appellant.

C. Officer Brumley's Deposition and Report

Officer Brumley's deposition and report were entered into evidence at the *Williams* rule hearing. In his deposition, Officer Brumley testified that both appellant and the victim claimed they were just having "rough sex." The victim seemed "aggravated" when she came to the door. Officer Brumley did not notice any marks or injuries on the victim.

Just as the officers were about to leave, the victim said, "Don't go anywhere, I'm leaving." The victim begged the officers to stay while she gathered her things. Officer Brumley thought "it was strange the way that she acted," going from saying everything was fine to "all of a sudden" saying she was leaving. Officer Brumley interviewed the victim outside and shined his flashlight on her to verify that she did not appear to have any injuries. Officer Brumley indicated in his report that the victim continued to state that "nothing happened" and that she just "wanted to go home."

D. Ms. Cairns' Testimony

Ms. Cairns, the victim's close friend, testified that in the early morning hours of April 30, 2014, she was working at a Vero Beach bar located about ten minutes away from appellant's home. Ms. Cairns received a call from the victim at "around 1:00" in the morning. The victim was "hysterically crying." The victim said she was in her car and was on her way to see Ms. Cairns. The victim arrived at the bar a few minutes later. The victim had swollen eyes, a red face, and a runny nose. The victim was

"almost hyperventilating from crying so hard." The victim was in her pajamas. Ms. Cairns explained that "for [the victim] to be out in public in her pajamas means that she was desperate to leave the situation that she was in." Ms. Cairns asked the victim to join her in the restroom.

The victim told Ms. Cairns that she got into an argument with appellant and it escalated. The victim said appellant choked her, and she "put her hands up to her neck in the motion of him strangling her." Ms. Cairns saw red finger marks on the victim's neck. Ms. Cairns took pictures of the marks on her phone at 1:47 a.m.

### E. Mr. Salvatore's Testimony

Mr. Salvatore worked at the bar with Ms. Cairns and was also a friend of the victim. He testified that the victim arrived at the bar sometime after the bar closed at 1:00 a.m. The victim was hysterical and extremely upset. Mr. Salvatore followed the victim and Ms. Cairns into the bathroom. The victim was hyperventilating.

Eventually, the victim said that she got into a fight with appellant "and then it escalated." According to the victim, appellant got on top of her, put his hands around her neck, and said, "I'll fucking kill you."

The victim explained that, when the police knocked on the door, appellant told the victim, "Be quiet, I'll handle the cops." Mr. Salvatore saw red markings around the victim's neck from where someone placed their hands.

### F. The trial court's pretrial rulings

The trial court entered a written order finding that the evidence of the April 30 strangulation incident was relevant to show premeditation and intent, and that its probative value was not substantially outweighed by any prejudicial effect. The trial court also entered an order finding that the victim's statements on April 30 were admissible as excited utterances.

### H. The *Williams* Rule Evidence Presented at Trial

At trial, the four live witnesses from the *Williams* rule hearing testified consistent with their hearing testimony. Officer Brumley's testimony was consistent with his deposition and report, though his trial testimony was less detailed. Additionally, two of appellant's friends testified that appellant made statements admitting that he and the victim were involved in a physical altercation on April 30th.

### Verdict and Sentence

The jury found appellant guilty of first-degree premeditated murder as charged. The jury did not unanimously vote for the death penalty. The trial court adjudicated appellant guilty and sentenced him to life in prison.

### It Was Not an Abuse of Discretion for the Trial Judge to Admit the Victim's Statements in the Bar to her Friends as Excited Utterances under Section 90.803(2), Florida Statutes.

Appellant argues that the trial court abused its discretion in admitting the victim's April 30th statements to her friends at the bar as excited utterances. According to appellant, the victim's calm demeanor and denial of any domestic violence when she spoke to the police prevent her later statements at the bar from being excited utterances. Appellant maintains that the victim "had time to reflect and did reflect" after the attack, as evidenced by the fact that she changed her story about the event.

We conclude that the trial court did not abuse its discretion in determining that the victim's April 30th statements amounted to excited utterances within the meaning of the statutory exception to the rule against hearsay.

A trial court's ruling that a statement qualifies as an excited utterance is reviewed for an abuse of discretion. *Cotton v. State*, 763 So. 2d 437, 440–41 (Fla. 4th DCA 2000).

The excited utterance exception to the hearsay rule provides for the admissibility of "[a] statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." § 90.803(2), Fla. Stat. (2019).

To qualify as an excited utterance, the statement must be made: "(1) regarding an event startling enough to cause nervous excitement; (2) before there was time to contrive or misrepresent; and (3) while the person was under the stress or excitement caused by the event." *Hayward v. State*, 24 So. 3d 17, 29 (Fla. 2009) (citations and internal quotation marks omitted).

"While an excited utterance need not be contemporaneous to the event, it must be made while the declarant is under the stress of the startling event and without time for reflection." *Hutchinson v. State*, 882 So. 2d 943, 951 (Fla. 2004), *abrogated on other grounds by Deparvine v. State*,

995 So. 2d 351 (Fla. 2008). "The statement must be made without time for reflective thought because it is the lack of time to contrive or misrepresent the facts that provides the reliability for such statements." *Hayward*, 24 So. 3d at 29. One court has observed that the "requirement that the statement must 'be made before there has been time to contrive and misrepresent' is simply a reformulation of the inquiry as to whether the statement was made when the witness was still under the influence of an overwhelming emotional condition." *People v. Straight*, 424 N.W.2d 257, 260 (Mich. 1988).

"The factors that the trial judge can consider in determining whether the necessary state of stress or excitement is present are the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event and the subject matter of the statements." *Hudson v. State*, 992 So. 2d 96, 108 (Fla. 2008) (brackets and internal quotation marks omitted).

"The test regarding the time elapsed is not a bright-line rule of hours or minutes." *Rogers v. State*, 660 So. 2d 237, 240 (Fla. 1995). In fact, the "excited state may exist a significant length of time after the event." Charles W. Ehrhardt, *Florida Evidence* § 803.2 (2020 ed.). While it "would be an exceptional case in which a statement made more than several hours after the event could qualify as an excited utterance," *State v. Jano*, 524 So. 2d 660, 663 (Fla. 1988), Florida courts have often concluded that statements made within about an hour of the event qualified as excited utterances. *See Jackson v. State* 419 So. 2d 394, 395–96 (Fla. 4th DCA 1982) (one hour); *Bell v. State*, 847 So. 2d 558, 561(Fla. 3d DCA 2003) (50 minutes).

By contrast, "where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process." *Jano*, 524 So. 2d at 662 (quoting Edward W. Cleary, *McCormick on Evidence*, § 297, at 856 (3d ed. 1984)). For example, when a statement is made in narrative form, this indicates that the declarant had time to reflect. *See Bienaime v. State*, 45 So. 3d 804, 808 (Fla. 4th DCA 2010); *Charlot v. State*, 679 So. 2d 844, 845 (Fla. 4th DCA 1996).

Some cases have concluded that a declarant's statement did not qualify as an excited utterance where the declarant had previously given an inconsistent statement about the same event. *See, e.g., Evans v. State*, 838 So. 2d 1090, 1093 (Fla. 2002) ("The statements at issue do not qualify under the excited utterance exception to the hearsay rule. . . . [The

7

declarants'] statements clearly were not made before they had time to contrive or misrepresent. A significant amount of time elapsed between the startling events and the statements. More importantly, both [declarants] *lied to the police officers who initially questioned them . . . ."*) (emphasis added); *Elysee v. State*, 920 So. 2d 1205, 1207–08 (Fla. 4th DCA 2006) (holding that the victim's statement was not an excited utterance where the victim initially told an officer during a traffic stop that the defendant was taking her home, but 15 to 20 minutes later, asked to speak with the officer alone and told him about the defendant's attempted sexual battery upon her in the vehicle; the State failed to demonstrate that the statements were made before there was time to engage in reflective thought, and the victim's own testimony—in which she admitted that she "got to thinking about it" before telling the officer what happened— demonstrated "beyond any question that she had engaged in reflective thought"); *Walters v. State*, 933 So. 2d 1229, 1230 (Fla. 3d DCA 2006) (holding that a statement did not qualify as an excited utterance where "three hours had elapsed since the startling event and, more importantly, Briggs, the declarant, had in fact misrepresented what had occurred by concocting a story that she and the defendant had been victims of a home invasion robbery").

This court's opinion in *Arrieta-Rolon v. State*, 36 So. 3d 124 (Fla. 4th DCA 2010), is illustrative. In *Arrieta-Rolon*, a case upon which appellant relies, this court concluded that the declarant had the time for reflective thought where she told the police a false version of the event before being asked to be moved away from the defendant:

> Here, the trial court overruled the defendant's objections without expressing whether it had considered those factors. . . . . ***The record also suggests that Fernanda was under greater stress immediately after the shooting than she was after the police arrived***. That is, immediately after the shooting, she ran away, frantically crying and searching for help. She then returned to the scene. When the police arrived twenty minutes later, she was still upset. ***But she told the police a false version of how the shooting occurred before asking to be moved away from the defendant***. Only after being put in the police car did she indicate that the defendant was the shooter. ***Such circumstances demonstrate that Fernanda had the time for reflective thought***. Thus, her statements to the police were not excited utterances.

*Id.* at 126–27 (emphasis added). This court also cited *Evans* and *Elysee* in support of its conclusion. *Id.* at 127.

In the context of domestic violence, however, we agree with those courts that have concluded that a declarant's initial false statement did not *automatically* remove subsequent statements from the scope of the excited utterance exception. Each case will turn on its own facts.

In *State v. Acrey*, 89 Wash. App. 1012, 1998 WL 54334 (1998), for example, the court concluded that the differences between the victim's initial denials of domestic violence and her later statement were not the result of time and the ability to reflect, but rather were the result of the defendant's intimidating presence during the denials:

> [The victim's] initial denials were made while she was still in the presence of a violent assailant and were accompanied by conduct exhibiting her fear of him. ***Under those facts, the trial court could reasonably infer that [the victim]'s false statements were the product of intimidation and fear of retaliation, rather than deliberation or reflection*.** The fact that the denials were transparently false ([the victim] and Steven had obvious injuries) supports a conclusion that they were not the product of any true deliberation. And . . . there is no evidence showing that [the victim] in fact debated what to tell police and then decided to invent facts. Under the circumstances, the trial court could properly conclude that [the victim]'s initial false statements did not evidence the type of reflection or deliberation forbidden under . . . the excited utterance rule.

*Id.* at *4 (emphasis added and footnote omitted); *see also State v. Magers*, 189 P.3d 126, 134 (Wash. 2008) (holding that the trial court did not abuse its discretion in admitting statements as excited utterances even though the declarant initially lied by denying the defendant's presence in the house; it was reasonable to conclude that the declarant's initial statement was due to her fear of the defendant).

Here, the trial court could reasonably have concluded that the "startling event or condition" under section 90.803(2) included not only the victim's physical altercation with appellant, where she was strangled, but her interaction with the police in the intimidating presence of appellant, a collective situation that would cause "stress of excitement." The victim's statements at the bar were made within 30 to 40 minutes of the police arriving at appellant's home to investigate the domestic disturbance and while the victim was in her pajamas, crying hysterically, and hyperventilating. Thus, the victim's statements at the bar met the first

and third prongs of *Hayward*—there was an event "startling enough to cause nervous excitement" and the victim was "under the stress or excitement caused by the event" at the bar when she made the statements. *Hayward*, 24 So. 3d at 29.

The close question here is whether the victim's statements at the bar meet the second prong of *Hayward*—whether the statements were made before there was time to contrive or misrepresent. To establish this prong, the State had to either (1) prove that the statements were made without time for reflective thought, or (2) if there was enough time to permit reflective thought, establish that the victim did not in fact engage in a reflective thought process.

In this case, there was evidence that the victim's statements at the bar were made without time for reflective thought or, alternatively, that the victim did not in fact engage in a reflective thought process before making those statements.

Notably, the victim's initial denials of domestic violence were made while she was still at appellant's home. They occurred after appellant told her to "be quiet" and that he would handle the cops. Under those facts, the trial court could reasonably conclude that the victim's initial denials were the product of intimidation or fear of retaliation, rather than a reflective thought process.

Furthermore, although the officers opined that the victim appeared to be calm, the victim also begged the officers to stay while she gathered her things to leave, suggesting that something was wrong.

The trial court could reasonably conclude that the victim was suppressing her emotions in the presence of the police. But once the victim got away from appellant, and no longer had to "keep it together" in front of the officers, the victim became increasingly upset due to the stress of the fight with appellant. Unlike *Arrieta-Rolon*, the victim appeared to be under greater stress *after she left appellant's apartment* than she was when police first arrived. It was not an abuse of discretion for the trial judge to conclude that the victim's subsequent statements to her friends, made within a short time after the fight with appellant and while she was visibly shaken and hyperventilating, did not appear to be the product of reflection. This is in contrast to *Elysee*, where the declarant essentially admitted in her testimony that she had engaged in reflective thought before changing her story to police. 920 So. 2d at 1207–08.

Accordingly, we conclude that the trial court did not abuse its discretion in admitting the victim's statements to her friends as excited utterances.

### *Evidence of the April 30 Domestic Incident was Properly Admitted as Evidence of Other Crimes, Wrongs, or Acts under Section 90.404(2), Florida Statutes*

Appellant next argues that the evidence about the April 30th incident was inadmissible because: (1) without the inadmissible hearsay, the collateral evidence was not relevant and was not substantially similar to the murder; (2) even assuming the hearsay statements were admissible, the April 30 evidence was irrelevant because the State failed to prove the collateral act by clear and convincing evidence; and (3) the probative value of the evidence was substantially outweighed by its prejudicial effect.

"In order to be preserved for further review by a higher court, an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation if it is to be considered preserved." *Tillman v. State*, 471 So. 2d 32, 35 (Fla. 1985).

Here, appellant did not argue below that the evidence of the April 30 strangulation should be excluded at trial because it was not proven by clear and convincing evidence. Nor did appellant argue below that the relevance of the April 30 incident was conditioned upon the admissibility of the victim's statements under the excited utterance exception. Thus, these specific components of appellant's argument on this issue were not preserved for appellate review.

Turning to the preserved component of appellant's argument, we conclude that the trial court did not abuse its discretion in admitting evidence of the April 30th incident. Relevant evidence is evidence tending to prove or disprove a material fact. § 90.401, Fla. Stat. (2019). All relevant evidence is admissible unless precluded by a specific rule of exclusion. § 90.402, Fla. Stat. (2019). Even if evidence is relevant, it is inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (2019).

Similar fact evidence of other crimes or wrongs, commonly known as *Williams* rule evidence, "is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or

accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity." § 90.404(2)(a), Fla. Stat. (2019). "Before allowing *Williams* rule evidence to be presented to the jury, the trial court must find that the State has proved that the defendant committed the collateral acts by clear and convincing evidence." *McLean v. State*, 934 So. 2d 1248, 1256 (Fla. 2006).

"When the purported relevancy of past crimes is to identify the perpetrator of the crime being tried, we have required a close similarity of facts, a unique or 'fingerprint' type of information, for the evidence to be relevant." *State v. Savino*, 567 So. 2d 892, 894 (Fla. 1990). "Substantial similarity is also required when the collateral crime evidence is sought to be admitted for the specific purpose of establishing absence of mistake or accident." *McLean*, 934 So. 2d at 1255 (brackets and internal quotation marks omitted).

It can be misleading, however, to refer to collateral crime evidence as "similar fact evidence" because "evidence of collateral crimes may be relevant and admissible even if it is not similar." Charles W. Ehrhardt, *Florida Evidence* § 404.9 (2020 ed.). "[E]ven if prior bad acts do not bear a striking similarity to the charged offenses, the prior acts are admissible if they are relevant to show motive and intent." *Harden v. State*, 87 So. 3d 1243, 1246 (Fla. 4th DCA 2012).

Evidence of a volatile relationship between the defendant and the victim—including evidence of prior incidents of domestic violence—is relevant to the issues of motive, intent, and premeditation. *See Dennis v. State*, 817 So. 2d 741, 762 (Fla. 2002) ("[T]he evidence of the nature of Dennis's relationship with the victim was relevant to establish Dennis's motive."); *Vargas v. State*, 101 So. 3d 1269, 1270 (Fla. 4th DCA 2012) ("Evidence of prior threats to a victim is relevant to prove motive, intent, and premeditation."); *Nicholson v. State*, 10 So. 3d 142, 146 (Fla. 4th DCA 2009) (holding that evidence of events in a previous domestic dispute, although consisting of prior bad acts, "were admissible as relevant to prove motive and intent" in a prosecution for first-degree murder); *Burgal v. State*, 740 So. 2d 82, 83 (Fla. 3d DCA 1999) ("[T]he prior incidents of domestic violence by defendant-appellant Burgal against the victim were properly admitted into evidence to prove motive, intent, and premeditation.").

Here, the trial court did not abuse its discretion in admitting the evidence that, two months before the murder, appellant strangled the

victim and threatened to kill her.[2]  This evidence was relevant to establish appellant's motive and premeditated intent.  Although this evidence was certainly prejudicial, its probative value was not substantially outweighed by the danger of unfair prejudice.  *See* § 90.403, Fla. Stat. (2019).  The evidence was not a feature of the trial, and the judge instructed the jury that it was to consider this evidence only for limited purposes.

### There was Sufficient Evidence of Premeditation to Support the First-Degree Murder Conviction

Appellant argues that the State's evidence as to premeditation was legally insufficient and that defense counsel was ineffective on the face of the record for not arguing that the State failed to prove premeditation.

An ineffective assistance claim may be raised on direct appeal only "when the ineffectiveness is obvious on the face of the record, the prejudice is indisputable, and tactical explanation is inconceivable." *Cohen v. State*, 230 So. 3d 18, 20 (Fla. 4th DCA 2017).  "For example, failure to move for a judgment of acquittal when the State has not proved an essential element of its case, when it is clear that the State could not reopen its case to prove that essential element, amounts to ineffective assistance of counsel that may sometimes be adequately assessed from the record on direct appeal." *Lesovsky v. State*, 198 So. 3d 988, 990 (Fla. 4th DCA 2016) (quoting *Bagnara v. State*, 189 So. 3d 167, 171 (Fla. 4th DCA 2016)).

Here, defense counsel's failure to move for a judgment of acquittal does not amount to ineffective assistance on the face of the record because there was sufficient evidence of premeditation to send the case to the jury.

"Premeditation is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act." *Asay v. State*, 580 So. 2d 610, 612 (Fla. 1991).  Stated another way, "[t]his purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act." *Woods v. State*, 733 So. 2d 980, 985 (Fla. 1999) (citation omitted).

---

[2] Even if the victim's hearsay statements were not considered, the remaining evidence of the April 30 incident still would have been relevant to issues of motive and intent because it would have established the volatile relationship between appellant and the victim.

"Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." *Larry v. State*, 104 So. 2d 352, 354 (Fla. 1958).

"Proof of a struggle between the killer and the decedent in a case of murder by strangulation constitutes evidence which will support a jury finding of premeditation." *Berube v. State*, 5 So. 3d 734, 745 (Fla. 2d DCA 2009); *see also Conde v. State*, 860 So. 2d 930, 943 (Fla. 2003) (concluding that there was sufficient evidence of premeditation in a strangulation case where the defendant had time to reflect upon his actions; the victim struggled during the attack, the victim had numerous defensive wounds, and the medical testimony indicated that it takes "approximately three minutes to strangle someone to death"); *McWatters v. State*, 36 So. 3d 613, 632 n.3 (Fla. 2010) ("This Court has held that there was sufficient evidence of premeditation in strangulation murders where there was evidence that the victim struggled.").

This court has also found sufficient evidence of premeditation where the defendant was romantically involved with the victim, the defendant had previously expressed an intent to kill the victim, and the defendant had drawn a gun on her the week prior to the murder. *See Fennell v. State*, 959 So. 2d 810, 813 (Fla. 4th DCA 2007).

Here, there was sufficient evidence of premeditation to submit the issue to the jury. The evidence in this case showed that: (1) appellant and the victim had a volatile romantic relationship; (2) two months before the murder, appellant strangled the victim and threatened to kill her; (3) the victim died of manual strangulation and had defensive wounds consistent with a struggle; and (4) the strangulation would have taken four to six minutes to kill the victim. In short, the evidence in this case demonstrated a murder by strangulation with signs of a struggle, coupled with a prior domestic violence incident in which appellant threatened to kill the victim.

We have considered the other issues raised by appellant and conclude that there was no reversible error.

*Affirmed.*

GERBER and KLINGENSMITH, JJ., concur.

* * *

*Not final until disposition of timely filed motion for rehearing.*